# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BANDERA MASTER FUND LP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0372-JTL |
| | ) | |
| BOARDWALK PIPELINE PARTNERS, LP, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION ADDRESSING ISSUES ON REMAND

Date Submitted: April 12, 2024
Date Decided: September 9, 2024

A. Thompson Bayliss, J. Peter Shindel, Jr., Daniel G. Paterno, Eric A. Veres, Samuel D. Cordle, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Plaintiffs.*

Srinivas M. Raju, Blake Rohrbacher, Matthew D. Perri, John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Rolin P. Bissell, James M. Yoch, Jr., YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Stephen P. Lamb, Andrew G. Gordon, Harris Fischman, Robert N. Kravitz, Carter E. Greenbaum, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; William Savitt, Sarah K. Eddy, Adam M. Gogolak, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Defendants.*

**LASTER, V.C.**

From 2005 until 2018, Boardwalk Pipeline Partners, LP ("Boardwalk" or the "Partnership") operated as a publicly traded Delaware limited partnership. Its general partner was Boardwalk GP, LP (the "General Partner"), another Delaware limited partnership. At all relevant times, Loews Corporation controlled the General Partner. Through the General Partner, Loews controlled Boardwalk.[1]

Boardwalk's partnership agreement[2] gave the General Partner the right to buy the publicly traded limited partnership units if certain conditions were met (the "Call Right"). The General Partner exercised the Call Right in 2018.

The plaintiffs contend that the General Partner breached the Partnership Agreement when exercising the Call Right because two conditions were not met. The first required that the General Partner receive "an Opinion of Counsel that the Partnership's status as an association not taxable as a corporation and not otherwise subject to an entity-level tax for federal, state or local income tax purposes has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers" (the "Opinion Condition").[3] The

---

[1] There are multiple entity defendants in this case, but Loews controls them all. This decision therefore refers generally to Loews as the party taking positions and making arguments.

[2] During the events giving rise to this case, the Third Amended and Restated Partnership Agreement dated June 17, 2008, governed Boardwalk's internal affairs. JX 352 (the "Partnership Agreement" or "PA").

[3] The Post-Trial Opinion referred to the opinion of counsel as the Opinion. That worked then, but now there are several judicial opinions in the mix, including the Post-Trial Opinion and two appellate opinions. Plus, on appeal, Loews characterized the advice another law firm gave in a powerpoint presentation as a formal opinion,

second condition required that the General Partner determine that the Opinion of Counsel was acceptable (the "Acceptability Condition").

Boardwalk owned and operated natural gas pipelines. The Federal Energy Regulatory Commission ("FERC" or the "Commission") regulates natural gas pipelines. In March 2018, FERC proposed a new policy that could have made limited partnerships far less attractive entities for owning pipelines. The proposed policy was not final, and industry players lobbied FERC to make extensive changes before adopting the final versions. One big question was how FERC would treat accumulated deferred income taxes ("ADIT"). Boardwalk made clear in its public comments that there was no way to determine the effect of FERC's proposal on Boardwalk's rates until FERC addressed ADIT. Boardwalk also made clear in its public comments that it would be improper to adjust any pipeline company's rates based solely on a change in tax treatment, because that would result in prohibited single-issue ratemaking.

Everyone expected FERC to provide additional clarification at its July 2018 meeting, just four months later. At that meeting, FERC finalized the proposed policy. FERC also determined that pipelines could eliminate their ADIT balances. That made limited partnerships far more attractive entities for owning pipelines.

---

and the Delaware Supreme Court adopted that characterization. This decision therefore refers to the opinion from counsel that the General Partner needed as either the "Opinion of Counsel" or the "Legal Opinion" and the opinion the General Partner obtained as the "Baker Opinion."

In the interim, Loews took advantage of the four-month period of uncertainty to exercise the Call Right. By doing so, Loews acquired the publicly traded limited partner units at a depressed price, even though the regulatory changes were not final and ultimately benefited Boardwalk.

The trial court conducted a four-day trial, made credibility determinations, weighed the evidence, and issued a lengthy opinion that included extensive factual findings (the "*Post-Trial Opinion*").[4] The *Post-Trial Opinion* found that Loews was only able to exercise the Call Right because its in-house legal team worked with an outside law firm to secure a contrived opinion. The *Post-Trial Opinion* found that the law firm had not rendered the opinion in subjective good faith but rather to reach the outcome Loews wanted. The *Post-Trial Opinion* therefore held that the General Partner breached the Partnership Agreement by exercising the Call Right without satisfying the Opinion Condition.

The *Post-Trial Opinion* also held that the General Partner breached the Partnership Agreement by exercising the Call Right without satisfying the Acceptability Condition. The trial court held that the Partnership Agreement was ambiguous regarding which of the two internal decision-makers at the General Partner would make the acceptability determination. Applying the doctrine of *contra proferentem*, the *Post-Trial Opinion* resolved the ambiguity in favor of the limited

---

[4] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2021 WL 5267734 (Del. Ch. Nov. 12, 2021) (subsequent history omitted).

3

partners. That meant the wrong General Partner decision-maker made the acceptability determination, resulting in a breach of the Partnership Agreement when the General Partner exercised the Call Right without satisfying the Acceptability Condition.

The plaintiffs had pursued alternative theories of recovery against the General Partner and other defendants. The adjudicated claim sufficed to support an award of damages, and the plaintiffs were only entitled to one recovery, so the *Post-Trial Opinion* did not reach the plaintiffs' other theories.

The Delaware Supreme Court reversed (the "*Supreme Court Opinion*").[5] The justices held that the proper internal decision-maker made the acceptability determination for the General Partner. The justices also held that the General Partner properly relied on advice from another law firm to the effect that it would be reasonable for the General Partner to rely on the Opinion of Counsel. Consequently, the General Partner was entitled to a conclusive presumption of good faith. The conclusive presumption in turn meant that the General Partner was exculpated and could not be liable for any damages.

The *Supreme Court Opinion* did not reach any other arguments advanced on appeal. The *Supreme Court Opinion* also did not alter or direct the trial court to revisit any of its factual findings. Nor did the *Supreme Court Opinion* expressly

---

[5] *Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083 (Del. 2022).

disturb the *Post-Trial Opinion's* ruling that the General Partner breached the Partnership Agreement by invoking the Call Right without first satisfying the Opinion Condition. Those findings and rulings are law of the case.

The Delaware Supreme Court remanded the case with instructions to consider the plaintiffs' remaining theories of recovery. Seeking to apply the *Supreme Court Opinion* faithfully, this decision concludes that the plaintiffs lack an alternative path to victory. That is not surprising: The *Post-Trial Opinion* addressed what the trial court believed were the strongest and most straightforward claims. After the *Supreme Court Opinion* cut off those theories, the plaintiffs faced an even steeper climb on remand. They were not able to reach the summit.

Judgment will be entered in favor of the defendants.

## I. FACTUAL BACKGROUND

The factual findings from the *Post-Trial Opinion* are law of the case. This decision summarizes the portions of the account most pertinent to the issues on remand.

### A. The Partnership

Boardwalk operated natural gas pipelines through three subsidiaries: Texas Gas Transmission, LLC ("Texas Gas"); Gulf South Pipeline Company, LP ("Gulf South"); and Gulf Crossing Pipeline Company LLC ("Gulf Crossing"). Loews formed Boardwalk and took the entity public in August 2005, after FERC authorized limited partnerships to incorporate an income tax allowance for the taxes paid by all of their

5

partners when calculating their cost of service for purposes of setting rates (the "2005 Policy"). That made pipelines organized as limited partnerships highly attractive.

Loews retained Michael Rosenwasser, then a partner at Vinson & Elkins LLP, to lead the legal team that prepared Boardwalk's organizational documents. Loews wanted a mechanism to take Boardwalk private if the 2005 Policy changed in a manner that was materially adverse to Boardwalk, and Rosenwasser drafted the Call Right to achieve that business objective.[6] Among other things, exercising the Call

---

[6] On appeal, Loews claimed that the trial court "theorized, without support, that the call right was meant to operate like an MAE clause in a merger agreement, broadly measuring the impact of regulatory action on Boardwalk's business." Appeal Dkt. 12 at 2. As discussed below, the trial court did not interpret the Call Right that way. For the present purpose of addressing the facts, what bears noting is that Loew's factual assertion is incorrect. There was factual support for the proposition that Loews' original goal was to guard against "the impact of regulatory action on Boardwalk's business." Rosenwasser himself testified that his team drafted the Call Right to address a business issue, not an abstract legal point. Rosenwasser Dep. 40. Loews wanted protection against a regulatory change that would have a materially adverse effect on Boardwalk. The Call Right was not supposed to be "easy to trigger" so that Loews could exercise it after a regulatory change that had no real-world effect. *Id.* at 45. Rosenwasser reiterated those points at trial, testifying that the term "material adverse effect" was "intended to make sure that if something wasn't substantive, wasn't meaningful, that it wouldn't be treated as triggering the call right." Rosenwasser Tr. 46. Rather than acknowledging Rosenwasser's testimony, Loews relied on appeal on (i) a statement by one of the original plaintiffs' attorneys when seeking approval for the settlement and (ii) an internal email by a representative of the current plaintiff. Appeal Dkt. 12 at 24, 32. Neither had any first-hand knowledge about the original purpose of the Call Right. Rosenwasser did.

The *Post-Trial Opinion* did not discuss the background of the Call Right to support an argument that the Opinion Condition operated like an MAE condition in a merger agreement. The *Post-Trial Opinion* reviewed the background to illustrate the divergence between the business goal that Loews originally sought to achieve and how Rosenwasser later interpreted the Call Right.

Right required that the General Partner obtain "an Opinion of Counsel that the Partnership's status as an association not taxable as a corporation . . . has or will reasonably likely in the future have a material adverse effect on the maximum applicable rate that can be charged to customers . . . ."[7]

## B.     The March 15 FERC Actions

On March 15, 2018, FERC took four interrelated actions that provided the impetus for this litigation (the "March 15 FERC Actions"). First, FERC proposed a new policy that would prohibit pipelines organized as partnerships from claiming an income tax allowance (the "Revised Policy"). The Revised Policy would not go into effect until FERC adopted final rules, so it had no effect on the maximum applicable rates that Boardwalk could charge.

---

On appeal, Loews also turned this discussion into the assertion that the trial court interpreted the Call Right as requiring a near-term effect on Boardwalk, rather than on Boardwalk's rates. Appeal Dkt. 12 at 31. Loews then argued that the trial court incorrectly required that the regulatory change have a material adverse effect on Boardwalk itself analogous to what Delaware courts have relied on for a materially adverse effect in a deal case. That was inaccurate. The *Post-Trial Opinion* accepted that Baker Botts decided to evaluate whether the regulatory change would have a materially adverse effect on recourse rates. *Post-Trial Op.*, 2021 WL 5267734, at *63. The trial court identified Baker Botts' failure to conduct its analysis in keeping with the implications of the decision to examine recourse rates as one of the reasons why the Baker Opinion was contrived. *Id.* at *65–66. The trial court examined the difference between what Baker Botts said it was doing and what the Baker Opinion did. The trial court did not criticize Baker Botts for not conducting its analysis as if it were opining on an MAE in a deal case.

[7] PA § 15.1(b)(ii).

7

Second, FERC issued a notice of a proposed rulemaking, confirming that it would promulgate regulations to address the tax allowance (the "NOPR"). The NOPR was not an actual rule, so it had no effect on the maximum applicable rates that Boardwalk could charge.

Third, FERC issued a notice of inquiry seeking comment on the treatment of ADIT (the "ADIT NOI"), including on whether the ADIT balance should be eliminated altogether. The ADIT NOI only asked for comment, so it had no effect on the maximum applicable rates that Boardwalk could charge.

Fourth, FERC issued an order in a specific pipeline case where the court's ruling had led to the March 15 FERC Actions. That was the only binding and immediately applicable component of the March 15 FERC Actions. It did not apply to Boardwalk, so it had no effect on the maximum applicable rates that Boardwalk could charge.[8]

The March 15 FERC Actions triggered a huge industry response. Over the next four months, shippers, pipelines, trade associations and others filed thirteen requests for rehearing, 108 comments, sixteen reply comments, and numerous other submissions. Matters were very much in flux. Nothing was final.

---

[8] Loews states in its brief on remand that the order "creat[ed] binding precedent for other MLPs, including Boardwalk." Dkt. 311 at 5. That is not true, any more so than an order this court entered against Loews would bind parties in other litigations. A court might view such an order as persuasive, but it is not binding.

The March 15 FERC Actions also could not have any effect on the maximum applicable rates that Boardwalk could charge because FERC-approved rates (known as "recourse rates") only can change through a litigated proceeding known as a rate case. The March 15 FERC Actions could only have a material adverse effect on Boardwalk's rates if (i) FERC issued rules implementing the Revised Policy without change, (ii) FERC resolved the ADIT issue in a manner adverse to pipeline companies, (iii) someone filed a rate case against one of Boardwalk's subsidiaries, and (iv) Boardwalk lost the rate case and had to reduce its rates in a material amount. None of those four things had happened.

FERC indicated that it would provide greater clarity on the outstanding regulatory issues soon. Boardwalk expected FERC to address the March 15 FERC Actions again at its next regular meeting on July 19, 2018.

## C.  The Immediate Response

FERC's announcement initially caused the stock prices of pipeline companies to drop. But FERC's announcement stressed that many pipelines would not face any risk of a rate reduction and identified factors that would lead to that result. Several pipeline companies promptly issued press releases stating that they did not anticipate any material effect on their rates.

The factors FERC cited as indicating which pipelines were not at risk for a rate reduction applied to Boardwalk's pipelines. Boardwalk's CEO told Loews that the

9

March 15 FERC Actions would have minimal impact on Boardwalk's rates. Boardwalk's General Counsel agreed.[9]

To pin down the issue, Boardwalk's CEO asked Ben Johnson, Boardwalk's Vice President of Rates and Tariffs, to analyze Boardwalk's pipelines. Johnson concluded that Boardwalk's pipeline subsidiaries faced minimal risk of a rate adjustment. Almost all of Gulf Crossing's volume was subject to negotiated rates, so the tax allowance issue would not affect those contracts. Gulf South enjoyed a rate case moratorium until May 2023 (five years in the future), plus a majority of Gulf South's volume was subject to negotiated or discounted rates. The only subsidiary with potential exposure was Texas Gas, but it operated in highly competitive markets, and a majority of its contracts used negotiated or discounted rates. Johnson flagged that the treatment of ADIT would be critical for understanding the implications of the March 15 FERC Actions.

Boardwalk management reported the results to Loews. Having concluded that the March 15 FERC Actions would not have a materially adverse impact on Boardwalk's rates, Boardwalk management drafted a press release saying that.

Loews had reached the same conclusion. But the Boardwalk and Loews executives also thought Loews might be able to use the March 15 FERC Actions as a trigger to exercise the Call Right. Preserving that option meant not saying publicly

---

[9] *See Post-Trial Op.*, 2021 WL 5267734, at \*16–17, \*19; *accord id.* at \*26, \*29.

that the March 15 FERC Actions would not have a materially adverse impact on Boardwalk's rates.

Loews therefore delayed Boardwalk's press release and edited it heavily to say Boardwalk did not anticipate any material effect on its revenues—not rates. Loews also struck the portions of the release that used the examples FERC had provided to explain why Boardwalk's pipelines were unlikely to face any rate adjustment. Boardwalk issued Loews' version of the release.[10]

## D.    Alpert's Initial Calls With Baker Botts

To exercise the Call Right, Loews needed to satisfy the Opinion Condition. Marc A. Alpert, Loews' Senior Vice President and General Counsel, learned that Rosenwasser, the drafter of the Call Right, had joined Baker Botts LLP. Alpert contacted Rosenwasser to ask whether he could issue the Opinion of Counsel. Alpert described the matter as urgent, and after the call, Rosenwasser quickly assembled a team of partners to do the work, plus a group of senior partners to act as an *ad hoc* opinion committee.

---

[10] On appeal, Loews stated, "Like other MLP pipelines, Boardwalk issued a press release saying it did not anticipate the March 15 actions would have an immediate impact on its results." Appeal Dkt. 12 at 11. On remand, Loews repeated that assertion, claiming that "[l]ike other MLP pipelines, Boardwalk issued a press release saying it did not anticipate the actions would have an immediate impact on its results." Dkt. 311 at 5. Not quite. Boardwalk management prepared a press release saying that the March 15 FERC Actions would not have a material effect on *rates*. Loews changed the language to reference *revenues*. JX 607 at 3. While both might be termed "results," the change was an early example of Loews manipulating matters to its advantage.

11

Hours after Boardwalk issued the Loews-approved press release, Alpert convened a call with Rosenwasser and other Baker Botts lawyers. Alpert had two questions. Had the press release affected Baker Botts' ability to issue the Opinion of Counsel? And were the March 15 FERC Actions sufficiently final to issue the Opinion of Counsel?

The next day, Baker Botts answered both questions. On the press release, Alpert got the answer he wanted: Because the press release talked about revenues rather than rates, it did not raise any issues. Loews' edits had paid off.

On the second issue, Alpert did not get what he wanted. Greg Wagner, a partner on the Baker Botts team who was "a true FERC expert,"[11] sent a detailed email explaining why the March 15 FERC Actions were not final and would not affect Boardwalk's rates.[12]

Four minutes later, Alpert requested a call with Baker Botts. During that call, Rosenwasser told Alpert what he wanted to hear, namely that the "most important thing <u>has</u> <u>happened</u>" so that "we're already there."[13] But because Wagner had provided a well-reasoned explanation supporting a different conclusion, Alpert asked Baker Botts to confirm Rosenwasser's answer and revert one week later.

---

[11] Rosenwasser Tr. 57 (describing Wagner as "a true FERC expert and – and, quite frankly, an expert in this particular area because of the clients he's represented over the years.").

[12] JX 626 at 1.

[13] JX 646 at 5.

### E. Rosenwasser's Syllogism

To get to the outcome Loews wanted, Rosenwasser crafted a syllogism. The Call Right referred to "maximum applicable rates," which he equated with recourse.[14] FERC used cost-of-service ratemaking to set Boardwalk's recourse rates, so Rosenwasser reasoned that any change in Boardwalk's cost of service would flow through to its rates. And because the cost-of-service calculation previously included a tax allowance, a policy change eliminating the tax allowance should do the trick.

On March 21, 2018, Rosenwasser explained his approach to Wagner, who documented the plan in his notes:

1 – A pipeline charges COS [cost-of-service] rates

2 – COS includes ITA [income tax allowance]

[No] ITA → material effect

No examination of FERC actions/shipper actions
COS/over/under-recovery

Just saying [no] ITA = lower COS

= MAE on max applicable rates[15]

---

[14] *See* JX 679 at 5, 8.

[15] JX 639 at 1.

As Wagner immediately perceived, Rosenwasser was "[j]ust saying" that removing the income tax allowance meant a lower cost of service, which would equate to a material adverse effect on maximum applicable rates.[16]

Rates only change after a rate case. Rosenwasser's syllogism sidestepped any assessment of when a rate case might be filed or what the outcome might be.

Rate cases involve examining a pipeline's entire cost of service. Changing rates based on a change in a single input is called single-issue ratemaking and prohibited. Rosenwasser's syllogism relied on single-issue ratemaking.

A rate case takes ADIT into account. Rosenwasser's syllogism did not account for ADIT. No one knew what would happen with ADIT, but everyone knew that the treatment of ADIT could affect the rate outcome substantially. The known unknown of ADIT defeated Rosenwasser's syllogism.

To prepare for the follow-up call with Alpert, Baker Botts drafted a memorandum identifying the issues that had to be resolved to render the Opinion of Counsel.[17] There were many, and Baker Botts resolved them all in Loews' favor.

One was the term "maximum applicable rates," which had no established meaning in FERC parlance. Boardwalk, however, had consistently used the term in

---

[16] On appeal, Loews asserted that "[t]here was no questionable 'syllogism.'" Appeal Dkt. 12 at 31. There was both a syllogism that Wagner recognized and documented, and it was questionable for each of the reasons identified above the line.

[17] JX 679.

its public filings and rate-case submissions to mean recourse rates. Baker Botts decided to interpret "maximum applicable rates" as recourse rates.[18]

Another was how to interpret the term "material adverse effect." If Baker Botts looked to existing Delaware case law, then that standard would be tough to meet. Baker Botts decided to look to materiality under the federal securities laws.

Yet another was the need for an analysis that showed a change in rates. The memorandum called for Boardwalk "to prepare an analysis of each pipeline's regulatory cost of service," first with an income tax allowance and then without.[19] That was the definition of single-issue ratemaking.

On March 29, 2018, Rosenwasser and Wagner spoke with Alpert. They agreed on the outcome Loews wanted: The March 15 FERC Actions were sufficiently final for Baker Botts to proceed.

---

[18] On appeal, Loews argued that the *Post-Trial Opinion* disagreed on this issue and found that Baker Botts acted in bad faith because the firm equated maximum applicable rates with recourse rates. Appeal Dkt. 12 at 32–33. That was not accurate. The *Post-Trial Opinion* observed that there could be ambiguity about the meaning of maximum applicable rates because it was not a settled FERC term, noted that Baker Botts resolved the issue in Loews' favor, and then evaluated whether Baker Botts accounted for the implications of that decision when rendering the Opinion. The *Post-Trial Opinion* faulted Baker Botts for not adhering to the implications of its decision to treat maximum applicable rates as meaning recourse rates, not for the firm's decision to interpret the term in that fashion in the first placed. *Post-Trial Op.*, 2021 WL 5267734, at *22–23, *58–61.

[19] JX 679 at 6.

15

## F.  The Financial Data

Boardwalk tasked Johnson with preparing the financial data Baker Botts needed. By April 4, 2018, Johnson reported that he had numbers that "should get us where we need to go."[20]

Johnson prepared a "Rate Model Analysis" for Baker Botts. In the Baker Opinion, Baker Botts called it a "Rate Model." But it wasn't a rate model and did not account for all of the issues in cost-of-service ratemaking, Johnson presented a hypothetical cost-of-service calculation, subtracted the income tax allowance, and showed that the new total was lower. Barry Sullivan, a rate expert that Baker Botts hired, told Baker Botts[21] and testified in this action that the so-called Rate Model Analysis was "not a recourse rate calculation."[22] To call the cost-of-service analysis a "Rate Model" was misleading.

---

[20] JX 713 at 1. Loews argues that Johnson only meant that his data could be used for the Opinion of Counsel. Dkt. 311 at 39. That is one possibility; however, Johnson had conducted an earlier analysis showing that the March 15 FERC Actions would not have a material effect on Boardwalk's rates. The new analysis generated the result that Loews wanted. After considering that contrast and seeing Johnson testify, the *Post-Trial Opinion* found that Johnson's statement referred to data that would get Loews to where it wanted to go, namely a basis to exercise the Call Right. *Post-Trial Op.* 2021 WL 5267734, at *23.

[21] JX 960 at 2.

[22] Sullivan Dep. 151; *accord id.* at 101–02, 118, 150–51, 168–69; *see id.* at 119–20 (testifying to additional steps involved in ratemaking that Johnson did not analyze).

Johnson's analysis assumed that each pipeline's ADIT balance would be returned to ratepayers through amortization over the life of each pipeline, an approach known as the "Reverse South Georgia Method." At that time, FERC had not decided how to treat the ADIT balance. One option, which pipelines favored, would be to eliminate the ADIT balance entirely. Another option, which shippers favored, would be to require a cash refund of the ADIT balance. Intermediate options involved amortizing the ADIT balance over various periods, like the South Georgia Method. Johnson only modeled the Reverse South Georgia Method. He did not include any sensitivities.[23]

Johnson's analysis did not include revenue calculations. They would have shown that both Gulf South and Gulf Crossing were under-recovering their cost of service and were in no danger of having their rates lowered. Texas Gas faced some risk of a rate case, but Wagner and Barry Sullivan, a rate expert that Baker Botts retained, agreed that Texas Gas faced minimal risk in the foreseeable future.

In his cover email, Johnson explained that he calculated "indicative rates that are postage stamp (i.e., every shipper pays the same maximum rate for each molecule) and unadjusted (i.e., does not adjust the maximum tariff rate for any under-recoveries of cost associated with either discounted or negotiated rate capacity that is below the

---

[23] Contrary to Loews' arguments on appeal, the *Post-Trial Opinion* did not fault Johnson for considering the Reverse South Georgia Method. That was one reasonable possibility. The *Post-Trial Opinion* faulted Johnson for only considering that possibility when (i) a range of alternatives existed and (ii) no one knew what FERC would do. *Post-Trial Op.*, 2021 WL 5267734, at *62–63.

maximum tariff rate)."[24] In reality, Boardwalk's pipelines do not have just one rate. In April 2018, they had 167 total recourse rates on file with FERC, and those rates covered nine different pipeline zones and incorporated forty-six different rate schedules. And Boardwalk's pipelines had lots of agreements calling for discounted or negotiated rates. Johnson's simplified approach did not work. Sullivan testified that "an indicative rate doesn't mean anything."[25]

---

[24] JX 727 at 2. *See also* JX 646 at 1 (Boardwalk executives and Baker Botts lawyers discussed whether they could estimate the effect of ADIT, concluding that they had "[n]o idea [because we] don't know rules"); JX 644 at 1 (noting the "lack of clarity on FERC's eventual policy on" the treatment of ADIT and characterizing any possible effects as "highly speculative at this point."); JX 740 at 1 ("[W]e may want to see the results under a few different scenarios."); JX 868 at 2 ("[D]ifferent assumptions on how to handle [the ADIT] issue could affect the calculations."); *see also* JX 1525 at 67 (Sullivan testifying that FERC was still determining "how [ADIT] balances will be treated"); JX 567 (Loews executives identifying same issues); JX 601 at 1–2 (same).

[25] Sullivan Dep. 169. On appeal, Loews attacked the trial court's finding by citing Johnson's testimony as the person who conducted the analysis. Appeal Dkt. 12 at 38–39. The court found the rate expert's disinterested testimony more persuasive. Also, although a small point, Loews represented on appeal that the rate model applied "an industry-standard ROE of 12%." *Id.* at 17. At trial, Johnson testified that he found that rate in an annual report issued by a shipper-side advocacy group that lobbies FERC to pursue rate cases against pipelines. Johnson Tr. 617, 658–59. The *Post-Trial Opinion* noted that "[i]t was not an unreasonable selection, but it also was not a pro-pipeline selection." *Post-Trial Op.*, 2021 WL 5267734, at *24. The court also noted that because it differed from the 10% rate that FERC proposed, the decision to use a different rate provided "another indication that Loews and Boardwalk did not think that the March 15 FERC Actions necessarily would be implemented as proposed." *Id.* That figure became an industry standard rate after FERC adopted it in July. Appeal Dkt. 12 at 17. It was not an industry standard rate when Johnson used it; it was a rate that shippers used when advocating for lower rates.

18

Most significantly, Johnson's analysis ignored that rate changes are not self-executing. Even if a pipeline's cost-of-service changes, recourse rates do not change until a pipeline loses a litigated rate case. The so-called Rate Model made no effort to incorporate the risk of a rate case. The analysis assumed a 100% likelihood that all of Boardwalk's pipelines would face a rate case immediately, lose, and have their rates reduced through singe-issue ratemaking.

**G.      Baker Botts Struggles With The Material Adverse Effect Inquiry.**

By the second week of April 2018, Baker Botts was struggling with the material adverse effect issue. Shortly after retaining Baker Botts, Alpert hired Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") and instructed them to shadow Baker Botts' work. Alpert hired Skadden after Rosenwasser suggested that another law firm advise on whether the Baker Opinion was acceptable. Rosenwasser thought that advice would entitle the General Partner to a conclusive presumption of good faith under the Partnership Agreement. That turned out to be a winning argument.

Now, Baker Botts wanted Skadden's help on the MAE question. As a matter of firm policy, however, Skadden would not opine on what constituted an MAE. And Skadden was skeptical about the claim that a 10–15% change in maximum applicable rates could be deemed in the abstract to qualify without delving into the facts.

Alpert wanted Skadden to support Baker Botts. When they resisted, Alpert emailed his colleague, Tom Watson, that Skadden was "pissing [him] off."[26] Watson's response flagged the core problem: "If people think the language says that the relevant test is what is the real-world effect, then we have an issue. I think it's crystal clear that we're talking hypothetical future max FERC rates."[27] In other words, the MAE analysis only worked under Rosenwasser's syllogism based on "hypothetical future max FERC rates." In the real world, the March 15 FERC Actions did not have any meaningful effect on rates, much less a material and adverse effect.

## H.    Baker Botts Works Towards A "Preliminary" Opinion Of Counsel.

Loews wanted a preliminary version of the Baker Opinion by the end of April 2018. That preliminary version would turn out to be an all-but-signed version.

Throughout April, Rosenwasser and his drafting team worked with the senior Baker Botts lawyers comprising an *ad hoc* opinion committee. The senior lawyers raised a number of concerns that highlighted how difficult it was to get to the outcome Loews wanted. There were two levels to the analysis: what the outcome should be, and what the Baker Opinion should say. They included:

- Whether and how to explain that Baker Botts was interpreting "maximum applicable rates" to mean recourse rates.

- Whether and how to explain that the March 15 FERC Actions would not have any effect on Boardwalk's recourse rates without a rate case.

[26] JX 798.

[27] *Id.*

- How to deal with the fact the March 15 FERC Actions were not final, could be revised significantly, and required clarification.

- Whether Baker Botts should be giving an opinion under Delaware law about the existence of a material adverse effect.

- Whether the Rate Model was sufficient to support the conclusion.

On appeal, Loews argued that by discussing these issues, the *Post-Trial Opinion* faulted the lawyers for being careful and thorough.[28] Not so. The *Post-Trial Opinion* discussed these issues to show how difficult it was for Rosenwasser to get to yes, even with his syllogism and the favorable assumptions he made. The *Post-Trial Opinion*'s finding of bad faith turned on a multi-factor analysis of the Baker Opinion itself, including the express and implicit assumptions that drove the outcome.[29]

## I.    Baker Botts Calls On Richards Layton.

To reassure his partners on the MAE issue, Rosenwasser contacted Richards, Layton & Finger, P.A. In a call on April 18, 2018, Rosenwasser told Richards Layton that a FERC rate expert had modeled a "decrease of 12.19% on top line revenue" for Texas Gas, an "11.70% decrease" for Gulf South, and a "15.62% decrease" for Gulf Crossing.[30] That was not true. Those were Johnson's calculations of the percentage changes in cost of service. Sullivan, the rate expert, refused to view the calculations as a rate analysis.

---

[28] Appeal Dkt. 12 at 30–31, 43.

[29] *Post-Trial Op.*, 2021 WL 5267734, at *70.

[30] JX 975; *see also id.* ("[T]op line revenue impact – excess of 10% impact.").

Rosenwasser also told Richards Layton that the FERC rate expert had projected that EBIT would decrease by 21–22% and distributable cash flow would decrease by "closer to 25%."[31] That was not true; Sullivan had not addressed those issues.[32]

Having provided that misleading information, Rosenwasser asked Richards Layton to consider whether a material adverse effect is "only measured based on the effects on the 'maximum rate' or is it measured by the effect on the business as a result of the decline in the maximum rate."[33] He also asked whether Richards Layton could support the assertion that an adverse effect in "excess of 10%" would be sufficient under Delaware law.[34] Less than twenty-four hours later, Richards Layton told Baker Botts orally that the "[b]etter [r]eading" was to "look [at] rates more, not effects" and that a long-term reduction of 12% was likely material.[35]

In response, the Baker Botts team clarified that their rate expert had *not* analyzed the effect on rates. Notes taken by a Baker Botts partner reveal that

---

[31] *Id.*; *see also id.* (noting "21% decline in net income" and "even higher in distribution").

[32] Sullivan Dep. 140–42 (discussing final Financial Data in JX 1398); *see also id.* at 141 ("Q: 'Did you offer an opinion regarding the calculation of DCF, EBITDA or EBIT?'; A: 'I do not believe I did specifically cite to EBITDA, EBIT or the DCF.'").

[33] JX 975; *see also* JX 957 at 2.

[34] JX 1502 at 21.

[35] JX 1007 at 1.

everyone focused on the core issue: There would be "no actual change—no effect yet screw min[ority]," which was a "challenging fact."[36]



Richards Layton agreed to put its advice into an email but cautioned that it would be heavily caveated and contain no language stronger than what was the better argument. Richards Layton stressed that Baker Botts could not reference the advice in its opinion.

**J.    Baker Botts Tells Loews It Can Deliver The Opinion Of Counsel.**

After his call with Richards Layton, Rosenwasser told Loews that there was "no show stopper" that would prevent him from giving the opinion, but he still needed one last internal approval.[37] Loews was not pleased.

---

[36] *Id.* at 1.

[37] *See* JX 1006 at 1.

The internal approval was signoff from the firm's chairman, who was at his daughter's wedding. Loews wanted an answer by Friday, April 20. Rosenwasser told Loews he could not get Baker's signoff until Monday, April 23.

That did not sit well with Loews. They wanted to know "why [Baker Botts] didn't anticipate this problem, and whether this is an indication that there may be a problem with the opinion committee?"[38] Alpert pressed Rosenwasser "to make absolutely sure" that there was no way to get the signoff.[39] Rosenwasser went to the mat with his partners and, four hours after Alpert's email, told him that Baker Botts would "be able to give the General Partner the Opinion of Counsel of Counsel if and when requested."[40] One hour later, Rosenwasser sent Alpert a draft (the "Preliminary Opinion of Counsel") that was in substantially the same form as the final Baker Opinion delivered more than two months later.[41]

---

[38] JX 1020 at 1.

[39] JX 1033 at 3.

[40] JX 1065.

[41] At his deposition, Rosenwasser denied that Baker Botts provided Loews any commitment on April 20. Instead, he claimed that Baker Botts gave Loews an indication that it was "more likely than not" that Baker Botts could deliver the Opinion of Counsel. Rosenwasser Dep. 122–23, 128–29, 257–82. That testimony was not credible. Baker Botts made clear that it was prepared to deliver the Opinion of Counsel if asked. *See* JX 1234 at 2; Grossman Dep. 76–77.

**K.      Skadden Signs Off.**

Alpert next asked Skadden to confirm that it would advise the General Partner that it would be reasonable for the General Partner to determine that the Baker Opinion was acceptable. Skadden reviewed the Preliminary Opinion of Counsel and objected to some of its language.

Alpert was furious, and he "threatened to fire Skadden."[42] He later told Rosenwasser that he had "senior management back-up to move to another firm if [Skadden] is not reasonable."[43] In an email to Skadden, Alpert demanded that Skadden confirm that they would say that the General Partner's board could rely on the Baker Botts opinion.[44]

Skadden relented. Alpert told his colleagues that Skadden "fell into line," but that he "[r]eally had to beat on them."[45] Alpert had planned to use Skadden to defend any litigation, but now he decided to find a different firm.

**L.      Boardwalk's Public Comments On The NOPR**

While Baker Botts was working on an Opinion of Counsel that treated the NOPR and other March 15 FERC Actions as final, Boardwalk management filed

---

[42] JX 1116 ("I told Skadden tell me today if [they] can't get there or I'll hire other counsel.").

[43] JX 1113 at 1.

[44] *Id.* at 1–2.

[45] JX 1136 at 1.

public comments on the NOPR, consistent with the fact that it was not final and that the eventual implementing regulations, not the NOPR, was what mattered.

After Boardwalk filed its public comments. Rosenwasser printed out a physical copy of the comments and made handwritten annotations. He underlined and double-starred key text:

> Until the Commission provides a final decision on the treatment of ADIT, Boardwalk cannot correctly assess the impact of the Revised Policy Statement and ADIT on its pipelines' costs of service, and any response in the Form No. 501-G will be misleading and inaccurate.

That was exactly what Baker Botts was doing—purporting to correctly assess the impact of FERC's actions on its pipelines' costs of service without knowing how FERC would treat ADIT.[46]

Other aspects of the comments were equally problematic for purposes of the Opinion of Counsel. For example:

- Boardwalk explained that without a determination on ADIT, matters were so unsettled that pipelines could not even have meaningful discussions about rates.[47] Yet Baker Botts was claiming for purposes of its Opinion of Counsel that matters were so settled that the firm could opine as a matter

---

[46] JX 1130 at 13–15 (underlining and annotations in original) (footnotes omitted). At trial, Rosenwasser claimed that he was not "reading it that closely" and that he starred or double-starred passages so that he could "go back and read it again." Rosenwasser Tr. 82. That testimony was not credible. Rosenwasser underlined, starred, and double-starred aspects of Boardwalk's comments because they fatally undermined the syllogism that drove the Baker Opinion. Revealing that he was reading the comments for problematic language, Rosenwasser wrote "nothing bad here" next to a passage reciting the procedural background. JX 1130 at 9.

[47] JX 1130 at 14.

of law that the March 15 FERC Actions would have a material adverse effect on Boardwalk's recourse rates.

- Boardwalk pointed out that the Policy Statement was "not a binding rule" and that FERC had not justified its application.[48] The Baker Opinion treated the Policy Statement as a binding rule. Rosenwasser drew a line next to this paragraph and also made an unintelligible note.

- Boardwalk objected that evaluating changes in cost-of-service requirements based solely on changes in income taxes constituted improper "single-issue ratemaking."[49] The cost-of-service analysis that Johnson created to support the Baker Opinion did the same thing.

- Boardwalk made clear that the Commission's treatment of ADIT was not known and that outcomes other than Reverse South Georgia were possible.[50] The Baker Opinion only contemplated using the Reverse South Georgia Method.

- Boardwalk asserted that its "fixed negotiated rate agreements . . .should not be affected by any potential impact to recourse rates . . . ."[51] The Baker Opinion ignored the existence of Boardwalk's fixed negotiated rate agreements.

- Boardwalk asserted there would be no impact on Gulf South due to a rate case moratorium.[52] The Baker Opinion ignored the rate moratorium and assumed a rate impact at Gulf South.

Through these comments, Boardwalk destroyed the basis for the Baker Opinion. It would be as if a financial advisor opined that a deal was fair based on a set of projections, a discounted cash-flow analysis, and comparisons to guideline public

---

[48] *Id.* at 2.

[49] *Id.* at 12, 30–31; *see* JX 1296 at 9.

[50] *See* JX 1130 at 13–14.

[51] *Id.* at 16.

[52] *Id.* at 20.

companies and transactions just after management announced publicly in an SEC filing that (i) the projections were unreliable and could not be used for valuation purposes, (ii) reliable projections could not be made until the federal governance addressed a specific tax issue, (iii) the company could not be valued using a discounted cash flow method, and (iv) there were no identifiable comparable companies or transactions.

**M.     The Potential Exercise Disclosures**

On April 30, 2018, Boardwalk and Loews each filed Form 10-Qs. Boardwalk's and Loews' filings each stated that in light of the March 15 FERC Actions, the General Partner was evaluating the potential exercise of the Call Right (the "Potential Exercise Disclosures"). Loews amended its Schedule 13-D to state that it was seriously considering exercising the Call Right.

As Loews had anticipated, Boardwalk's trading price initially bumped up in anticipation of a take-private. But as the Call Right's backward-looking formula for calculating the price sunk in, Boardwalk's trading price declined steadily.

**N.     The ADIT Issue Gets Worse For Baker Botts.**

In mid-May 2018, Baker Botts' approach to ADIT suffered another hit. The only binding aspect of the March 15 FERC Actions directed a specific pipeline to make a rate filing consistent with the Revised Policy and without claiming a tax allowance. In the resulting filing, the company eliminated its ADIT balance. If correct, that approach would be a boon for Boardwalk but fatal to the Legal Opinion.

28

Boardwalk wanted FERC to eliminate the ADIT balance but could not advocate for that approach without undercutting the Baker Opinion. Instead, Boardwalk management lobbied FERC for that outcome through their involvement with the Interstate Natural Gas Association of America ("INGAA").[53]

Even though ADIT was an unsettled issue and multiple outcomes were possible, including eliminating the ADIT balance entirely, Baker Botts did not update the assumption in the Preliminary Opinion of Counsel.

## O.    This Litigation And The Original Settlement

On May 24, 2018, two holders of common units filed this action and moved for expedited proceedings. Loews opposed the motion, arguing that the dispute was not ripe because the General Partner had not decided to exercise the Call Right. The court agreed with Loews and denied the motion.

In their brief on appeal, Loews criticized the trial court for saying during its ruling that it had a "bad feeling" about the case, implying at that the court had pre-

---

[53] On remand, Loews claimed misleadingly that Boardwalk management "did not advocate to eliminate ADIT through INGAA" and were not heavily involved "as evidenced by the fact that Johnson was shown just one email exchange between himself and INGAA, unrelated to AIDT." Dkt. 311 at 39. That was because Loews invoked privilege for their work with INGAA. The *Post-Trial Opinion* found otherwise, relying in part on the nearly thirty documents relating to INGAA that appeared on Boardwalk's privilege log. *See Post-Trial Op.*, 2021 WL 5267734, at *46, *46 n.15.

judged the merits.[54] The court used that phrase as a *Star Wars* homage because a

prequel had just been released.[55] The court then explained why the phrase was apt:

> So why do I have a bad feeling about this? It looks to me an awful lot like how people used to sue on the announcement of a proposed controller deal, get in there with a not-yet-ripe complaint, and then achieve some transaction-based resolution that would set up a global settlement.
>
> I don't know that that is what would happen here. Certainly Mr. Gorris and his firm are not folks who bring those types of cases. But the right to call the public's units is essentially a contractual go-private opportunity, exercisable by the party that controls the operations of the MLP, which is, here, the general partner and its affiliate, Loews.
>
> And this is a case that has been filed at a time when it is not clear what the general partner's going to do, although there are certainly indications that the general partner is going to exercise that right. It's a case that requests fast expedition, much like the old go-private challenges that would result in these harmonic-convergence settlements. And the whole thing, to my mind, has an air of the manufactured about it.[56]

The court was thus concerned about the plaintiffs' fast filing and the similarity

between the lawsuit and cases from the sue-on-every-deal era.

---

[54] Appeal Dkt. 12 at 24.

[55] Dkt. 30 at 24–25 ("Let me tell you up-front that I'm going to deny the motion for expedited proceedings. As a general matter, I have a bad feeling about this. And I say that both factually and also in a cultural hat tip to the movie *Solo*, which is in theaters right now. You-all probably remember that line if any of you, like I am, are part of the generation that went eagerly to see A New Hope when it was originally in theaters and when we only knew it as Star Wars rather than as Episode IV. That line, of course, became memorialized and is repeated, if not once, then multiple times in every *Star Wars* movie.").

[56] *Id.* at 25–26.

Eighteen days after the lawsuit was filed, the plaintiffs settled in exchange for Loews agreeing to exercise the Call Right on or before June 29, 2018. The plaintiffs understood that Loews wanted to exercise the Call Right, and they offered up a settlement if Loews did what it wanted to do.[57] The parties thus reached a fast settlement, just as in the sue-on-every-deal era. And despite defeating the motion to expedite on the theory that the claims were not ripe, defense counsel treated the claims as sufficiently ripe to settle. The defendants had thus taken inconsistent positions.

The parties asked the court to review the settlement papers *in camera* and indicate whether it would approve it. The court declined that request as seeking a non-public advisory opinion. That night, the parties filed a stipulation of settlement that called for the General Partner to exercise the Call Right on or before June 29, 2018. That date was optimal for Loews because the buy in would be over before FERC's regularly scheduled meeting on July 19, when FERC was expected to make additional announcements about ADIT and other topics.[58]

---

[57] Dkt. 56 Ex. 1.

[58] On appeal, Loews asserted that the *Post-Trial Opinion* improperly found that "Loews rushed to exercise the call right before the July 19 FERC meeting and potential decision on ADIT." Appeal Dkt. 12 at 37. The July 19 FERC meeting was significant not because Loews had some foresight about what specifically would happen, but because FERC was expected to announce something that would provide more certainty. To have a motive to exercise before the July 19 meeting, Loews did not have to know specifically what FERC would do.

**P.     The General Partner Exercises The Call Right.**

Believing that the settlement would release any challenges to the exercise of the Call Right, Loews asked its advisors to finalize their work product. On June 29, 2018, Baker Botts delivered its opinion. It was substantially unchanged from the Preliminary Opinion of Counsel.

After receiving the Baker Opinion, Loews caused the General Partner to exercise the Call Right. Ten days later, on July 18, 2018, the transaction closed.

**Q.     FERC Makes Its Determinations.**

Hours after the closing, FERC announced a final rule on the tax allowance issue. FERC both eliminated the income tax allowance and any ADIT balances. FERC reiterated that a rate reduction might not be required for pipelines having particular attributes, listing examples that applied to Boardwalk's subsidiaries.

The final rule meant there would be no effect on Boardwalk's recourse rates. When one of his colleagues asked Rosenwasser about the announcement, he responded: "Seems all mitigates adverse effect without changing policy. Loews buy in of [B]oardwalk closed day before order came out."[59]

**R.     The Current Plaintiffs Litigate The Case.**

The current plaintiffs objected to the settlement. On September 28, 2018, the court declined to approve it, returning to concerns expressed during the motion to expedite:

---

[59] JX 1569.

I am not going to approve this settlement. I had a bad feeling about this case at the outset. The way you-all proceeded confirmed that bad feeling. I'm not satisfied with the level of investigation that went into the settlement. I'm also not satisfied that the "give" of the global release is reasonable in light of the "get" of the option exercise.[60]

On appeal, Loews cited the "bad feeling" reference to argue that the trial court had prejudged the case. Not so. The court started out concerned about a prematurely filed case leading to a fast settlement. When that actually happened, it accentuated the court's concern.

The court also was concerned that while the settlement avoided future harm, it did not do anything to remedy any injury the unit holders had already suffered. To illustrate the difference, the court used an analogy:

I'm not saying that there isn't some consideration here. Essentially what the plaintiffs did is they came along and, if you want to use an analogy that spins things the plaintiffs' way, there were some muggers beating up a guy. And what you guys got the muggers to do is stop beating up the guy. Is there value in stopping a person from getting beat up? Sure. There's value in that.

But part of whether it's enough just to get them to stop depends on how hurt he is. If he's not at all hurt, then getting them to stop is great. That's plenty, that's fine. And certainly, compared to letting them keep on beating him up, that's a good thing. But if he's already got two broken legs and a concussion and a bunch of bruises, then just saying, "Hey, we got them to stop. That's enough. We'll see you later. Have a nice life. We'll give the muggers a release for everything else," that doesn't strike me as a range-of-reasonableness trade.

Now, I don't know what really happened. I'm sure the defendants would call that an incendiary analogy. I don't know whether the defendants here are accurately portrayed as muggers or not. Maybe they are just, indeed, doing what their contract permits. But in terms of analyzing the

---

[60] Dkt. 82 at 81–82.

nature of the consideration, stopping the harm is certainly some consideration. The question is whether stopping the harm is enough consideration. I'm not convinced it was. And as I said before, I am also not at all satisfied that there was sufficient investigation into what happened here.[61]

On appeal, Loews took umbrage at the analogy, argued again that the trial court prejudged the case, and claimed the trial court had already concluded that the defendants were "muggers."[62] It would have been better if the court had thought of a different analogy—perhaps involving a leaking pipe and an already flooded basement where fixing the leak would stop the water flowing but not do anything to address the existing water damage. The court did not conclude at the outset that the defendants were criminals.[63]

---

[61] Dkt. 82 at 80–82.

[62] Appeal Dkt. 12 at 24 ("[R]emarkably, given the preliminary posture—[the court] characterized defendants as 'some muggers beating up a guy.'"); Appeal Dkt. 21 at 31 n.3 ("The trial court kicked this case off by rejecting a proposed settlement with the original plaintiffs because it 'had a bad feeling about [the] case at the outset.' Why? Because defendants were 'some muggers beating up a guy,' and all the original plaintiffs were doing was 'stopping a person from getting beat up.'")

[63] Loews criticizes the court for saying that "it does seem to me that this is a situation where the settlement effectively greased the skids for a transaction the defendants want to do anyway." Dkt. 82 at 83. That was an accurate description of what happened. The court also expressed concern about Loews' change of position. When denying the motion to expedite, the court agreed with Loews' assertion that the case was not yet ripe. Yet Loews immediately turned around and offered a settlement. As the court explained, "That strikes me as having it both ways. That strikes me as you-all not being fully forthcoming in terms of how ready the case was to resolve. If it was that ready to resolve, then it was that ready to litigate, and this case could have gone forward at that time." *Id.* at 82–83.

S.      The *Post-Trial Opinion*

Because the current plaintiffs prevailed on their objections, the court permitted them to take over the litigation. The parties litigated the case through trial.

In the *Post-Trial Opinion*, the trial court ruled in favor of the plaintiffs, finding that the General Partner had breached the Partnership Agreement when exercising the Call Right because the General Partner had not satisfied either the Opinion Condition or the Acceptability Condition. The trial court found that the Baker Opinion "did not reflect a good faith effort to discern the actual facts and apply professional judgment."[64]

The *Post-Trial Opinion* reached this conclusion because the Baker Opinion contradicted real world facts that Baker Botts and its client knew, understood, and acknowledged. Because of those facts, Baker Botts could not have believed in good faith that it was *more likely than not* that the *non-final* March 15 FERC Actions *had or were reasonably likely in the future* to have a *material adverse effect* on the *recourse rates* that Boardwalk's subsidiaries could charge. In fact, Baker Botts and its client knew the opposite was true: Recourse rates were *unlikely to change at all*, and no one could determine whether or not they would change without knowing how FERC would treat ADIT balances.

The *Post-Trial Opinion* also applied the doctrine of *contra proferentem* to hold that the wrong decisionmaker made the acceptability determination necessary to

---

[64] *Post-Trial Op.*, 2021 WL 5267734, at *52.

satisfy the Acceptability Condition.[65] The General Partner did not have a board of directors of its own. Instead, its general partner was single member Delaware LLC (the "GPGP"). That entity had board of directors which, under the federal securities laws, had to have at least three independent directors (the "GPGP Board").[66] The GPGP also had a sole member that Loews wholly controlled (the "Sole Member"). The *Post-Trial Opinion* concluded that under the doctrine of *contra proferentem*, the GPGP Board had to make the acceptability determination.[67] Because the Sole Member made the acceptability determination, the *Post-Trial Opinion* concluded that the Acceptability Condition was not satisfied, providing a separate reason why the General Partner breached the Partnership Agreement when exercising the Call Right.[68]

---

[65] *Id.* at *71, *78.

[66] SEC regulation and NYSE rules require board of directors of listed companies to have an audit committee comprising at least three members, all of whom must be independent directors of the board. *See* New York Stock Exchange Listed Company Manual § 303A.07(a); *accord* 15 U.S.C. § 78j-1(m); 17 C.F.R. § 240.10A-3(b)(1)(i). If the listed company does not have an audit committee, then the entire board of directors is treated as the audit committee for purpose of the regulation. 15 U.S.C. §78c(a)(58)(B). When the listed company is a limited partnership, this standard applies to the "board of directors of the managing general partner, managing member or equivalent body." 17 C.F.R. § 240.10A-3(e)(3).

[67] *Id.* at *78.

[68] *Id.*

**T.    The Appeal**

After the entry of a partial final judgment, Loews appealed. The plaintiffs cross

appealed on the issue of damages, which the Delaware Supreme Court did not reach.

**1.    Loews' Arguments**

On appeal, Loews raised a host of purported legal errors. Loews also challenged

the *Post-Trial Opinion's* factual findings, contending that the trial court was biased,

made it all up, and unfairly indicted every lawyer in the case.[69] Reviewing some of

---

[69] *E.g.* Appeal Dkt. 12 at 2 ("[R]ather than enforce the LPA, the Court of Chancery discerned a nefarious conspiracy of top-flight lawyers, somehow bullied into professional malfeasance to the point of delivering 'whitewash[ed]' 'contrivances' instead of reasoned legal opinions rendered in good faith."); *id.* at 4 ("The opinion below rests on systematic errors of law and fact, mounts an indecorous, unjustified attack on the integrity of reputable attorneys, substitutes the court's judgment for that of independent counsel, departs without justification from market evidence and this Court's valuation precedents, and in all those ways rewrites rather than enforces the LPA."); *id.* at 25 ("The court dismissed the unanimous sworn testimony of Loews's and Boardwalk's outside counsel as 'a reshaping' of the facts. . . . In a handful of emails capturing counsel's preliminary discussion of some of the questions at issue, the court saw an effort to produce a 'contrived' opinion rooted in purportedly manipulated financial data."); *id.* at 47–48 ("The court's rejection of Baker's opinion thus rests on an unsupported holding that impugns the integrity and good faith of virtually every attorney involved: close-to-retired expert in his field Rosenwasser and his partners at Baker; several Skadden attorneys; RLF; Ramey Layne from Vinson & Elkins; in-house counsel Alpert and McMahon; and even the attorneys for the original plaintiffs."); *id.* at 48 ("The point merits emphasis: The trial court's determination to reject Baker's opinion cannot stand because it relies on a finding of lawyer bad faith that lacks all support in the evidence."); *id.* ("And this point merits emphasis too: In a published Delaware judicial decision, the world has been told that Baker acted in bad faith; Skadden engineered a "whitewash"; RLF facilitated a conspiracy. These are harsh, reputation-damaging conclusions. They should be made cautiously, based only on real evidence, and not just because a court may disagree with a lawyer's reasoned professional judgment. And these conclusions surely had no place here— where the law required substantial deference to counsel and where the record showed not a grand conspiracy but diligence by all involved." (footnote and citation omitted));

Appeal Dkt. 21 at 1 ("Left unreviewed, the decision will overthrow *Williams* and leave lawyers' opinions subject to hostile *de novo* review whenever a trial court's views differ from those of counsel. The decision imposes fiduciary-type obligations inconsistent with the terms of an LP agreement, contrary to long precedent. The decision invokes *contra proferentem* to undermine the reasonable expectations of investors, likewise contrary to long precedent. The decision throws into doubt the reliability of Delaware-law exculpation provisions. The decision sanctions the unprincipled disregard of market evidence in calculating damages, in direct opposition to this Court's teaching. The decision imports appraisal-style remedies into the law of contract. The decision will leave lawyers the world over wondering whether Delaware's courts view them as officers of the court or untrustworthy 'rationalizers.' The decision awards the largest class damages amount in Delaware's history, based on fact-findings without evidentiary support."); *id.* at 2 ("And yet here we are, with a startling 193-page opinion that looks behind every judgment and accuses everyone involved of bad faith and contrivance."); *id.* ("From that atextual perspective, the court viewed every judgment Baker made based on the contract's actual language as 'bad faith.' Every internal and external assurance of no short-term business impact became a smoking gun. This Court need not examine every finding in the improbably one-sided novel-length decision below to see how dramatically the trial court went off track."); *id.* at 4 ("Reading the contract as written and the facts with anything like a neutral eye, as *Williams* requires, yields the inescapable conclusion that Baker acted in good-faith exercise of its professional duties."); *id.* at 6 ("The trial court's failure to apply the LPA as written and refusal to accord deference to Baker's reasoned opinion mark departures from law."); *id.* at 9 ("But the trial court determined to reach a decision as to Baker's opinion shared by no one who contemporaneously considered the question."); *id.* at 10 ("[F]air review of the contract's words through the lens of *Williams* reveals a rotten core in each position plaintiffs advanced and the trial court accepted."); *id.* at 20 ("The trial court's contrary findings pair disregard of the contractual text with unsupported inferences from the record."); *id.* at 30 ("These claimed 'conflicts' are thus phantoms, conjured to distort the application of Section 15.1(b). None justifies the trial court's determination to throw over *Williams* and subject the call-right opinion to hostile *de novo* review."); *id.* at 34 ("There is thus an astonishing gulf between the deafening exculpatory silence of this unexpurgated evidentiary record and the trial court's extreme findings of corrupt bad faith. These unsupported findings of bad faith defy ready explanation."); *id.* at 46 ("The only other thing plaintiffs cite is the trial court's undifferentiated, uncited utterance finding that Siegel, along with Alpert, McMahon, and Johnson, 'orchestrated the sham Opinion . . . and diverted the acceptability determination . . . from the GPGP Board to Holdings.' That finding is insupportable." (citation omitted)).

those arguments helps frame the issues for remand. Reviewing some of those arguments also could be helpful to the Delaware Supreme Court if the plaintiffs appeal, because Loews likely will argue that the justices should determine that the Baker Opinion satisfied the Opinion Condition and affirm on that alternative ground.

### a.     Misrepresenting The Concept Of A Non-Reasoned Opinion

As one of its principal arguments on appeal, Loews mischaracterized what constitutes a "non-reasoned" opinion and what role that played in the *Post-Trial Opinion*'s analysis. The sophisticated lawyers representing Loews know exactly what terms like "non-reasoned" or "non-explained" mean when applied to opinions. To argue otherwise reflected the same type of factual misrepresentation found in the Baker Opinion.

In its appellate briefs, Loews objected that the *Post-Trial Opinion* "repeatedly labelled Baker's opinion 'non-explained'" and claimed that that finding "cannot be sustained" because the Baker Opinion was supported by a legal memorandum and back-up documentation.[70] At oral argument, defense counsel contended "[t]he court's ultimate reason for looking behind this opinion was that it was unexplained."[71]

---

[70] Appeal Dkt. 12 at 30–31; *accord* Appeal Dkt. 21 at 11 ("That finding [regarding the opinion being non-explained] is contrary to the evidence. Baker's opinion was explained by a learned 50-page legal memorandum and 200 pages of documentary support."); *see id.* at 1 (describing the Baker Opinion as "a reasoned opinion").

[71] Oral Argument at 15; *accord id.* at 4 ("The trial court justified this departure from *Williams* because it said Baker's opinion was not explained, not explained. It said that. The trial court did over and over again.").

In opinion practice, terms like "non-reasoned" and "reasoned" have established meanings:

> A "non-explained opinion" (often referred to as a "clean opinion") refers to a professional judgment regarding a specific legal issue relevant to the Client, the Transaction Documents or the Transaction as to which the Opinion Giver, after appropriate consideration of the facts and the law, is willing to express a professional judgment (subject to the normal assumptions discussed in the Accord and, if applicable, the General Qualifications) *in a conclusory manner without the support of any legal analysis set forth in the Opinion Letter.*[72]

When an opinion is non-reasoned, that does not mean that no reasoning went into it; it means the opinion itself does not contain any legal reasoning supported by citations to cases or statutes. By contrast a "'reasoned opinion' expresses not only a legal conclusion but also provides or summarizes the legal analysis supporting that conclusion. Explained opinions often deal with issues involving legal uncertainties due to the nature of the process (e.g., bankruptcy), conflicting authority or perhaps lack of authority."[73]

---

[72] *E.g.*, Committee on Legal Opinions, *Third-Party Legal Opinion Report, Including The Legal Opinion Accord, Of The Section of Business Law, American Bar Association*, 47 Bus. Law. 167, 230 (1991) (emphasis added); *see also* Kevin P. Heaney, *An Introduction to Third-Party Closing Opinion Letters (Part 1)*, Prac. Real Est. Law., May 2019, at *6 n.12 ("Opinions are frequently categorized as 'clean,' 'bond' or 'non-explained' opinions on the one hand and 'reasoned' or 'explained' opinions on the other.").

[73] Committee on Legal Opinions, *supra* note 72, at 230; *see* Robert J. Krapf, Antonios Roustopoulos, *Delaware Third-Party Legal Opinions on Remedies in Real Estate Financing Transactions: A Primer*, 17 Del. L. Rev. 35, 37 (2018) ("The type of opinion letter discussed in this article is a written letter stating the Opinion Giver's reasoned conclusions on the application to certain stated, agreed or assumed facts of certain Delaware laws and legal principles applicable to the Client, the Transaction

The trial court did not review the Baker Opinion *de novo* at all, and in any event not because it was a non-explained opinion. The non-explained nature of the opinion was significant because the Baker Opinion addressed a difficult and complex issue.[74] Non-explained opinions are inappropriate for difficult and complex issues. "With respect to a legal issue of known uncertainty or that poses obviously difficult and uncertain questions of professional judgment, a non-explained opinion should not be requested."[75] For Baker Botts, however, making the opinion a non-explained opinion meant the underlying reasoning would not be laid out for potential challenge.

The *Post-Trial Opinion* considered multiple factors before concluding that Baker Botts stretched its analysis to reach the result Loews wanted. All else equal, someone who has reached for a result will not want their analysis out in the open and subject to criticism. To deliver a non-reasoned opinion on a complex and difficult issue sent a negative signal about Baker Botts' mindset. It was part of the overall calculus, not the force driving the result. And in any event, the trial court used the terms "non-explained" and "non-reasoned" as the terms of art they are, not as Loews portrayed them on appeal.

---

Documents or the Real Estate Financing Transaction, and subject to the exceptions, qualifications and other limitations expressed in the opinion letter or otherwise implied based on customary practice.").

[74] Rosenwasser Tr. 56–57 (explaining that he assembled a bigger team than if he had been dealing with "an opinion that was a conventional opinion" and that the Call Right "was a nonconventional provision in a partnership agreement").

[75] Third-Party Legal Opinion Report, *supra*, at 227.

### b. Mischaracterizing The Discussion Of Non-Delaware Firms Addressing Delaware Issues.

In another argument on appeal, Loews mischaracterized the *Post-Trial Opinion* as holding that non-Delaware lawyers are unqualified to analyze issues of Delaware law.[76] That is not what the *Post-Trial Opinion* said.

The *Post-Trial Opinion* focused on rendering formal opinions on matters of Delaware law, not thinking about or advising on issues of Delaware law. Many non-Delaware firms regularly render opinions on straightforward issues of Delaware. They do not regularly opine on complex issues of Delaware law.[77] The major Delaware law firms have thriving opinion practices because of that distinction.

The *Post-Trial Opinion* also discussed Baker Botts' own opinion practice. The firm regularly rendered enforceability opinions under the Delaware Limited Partnership Act, but the firm did not opine on more complex issues of Delaware law.[78]

---

[76] *See* Appeal Dkt. 21 at 26 (criticizing "the trial court's *sua sponte* suggestion that a 'non-Delaware law firm' cannot reliably analyze a contractual provision governed by Delaware law."); *id.* ("Corporate entities from all over the world retain lawyers from all over the country to advise on Delaware law matters. Before the decision below, Delaware's courts had never suggested that non-Delaware lawyers were unqualified to address Delaware corporate law matters. Corporations and practitioners would benefit from this Court's clear statement if Delaware intends to adopt the parochial view plaintiffs now sponsor."); *see also* Appeal Dkt. 12 at 41 ("[T]he suggestion that non-Delaware lawyers are unqualified to opine on Delaware law is unprecedented and inconsistent with the national scope of Delaware's corporate jurisprudence.").

[77] *Post-Trial Op.*, 2021 WL 5267734, at *53.

[78] *See* JX 878 at 4.

Internally, Baker Botts attorneysf questioned its ability to render the Baker Opinion under Delaware law.[79]

In the Baker Opinion, a non-Delaware firm issued an opinion on a complex issue of Delaware law that Baker Botts attorneys questioned whether the firm should be rendering. Baker Botts' own practice was a factor that the *Post-Trial Opinion* took into account when determining that Baker Botts stretched to reach its conclusion.[80]

### c. The Assertion That The Court Determined That Every Law Firm Involved Acted In Bad Faith

Loews also claimed on appeal that "the Court of Chancery discerned a nefarious conspiracy of top-flight lawyers, somehow bullied into professional malfeasance to the point of delivering 'whitewash[ed]' 'contrivances' instead of reasoned legal opinions rendered in good faith."[81] On the next page, Loews

---

[79] *Post-Trial Op.*, 2021 WL 5267734, at *68.

[80] Loews also asserted on appeal that Baker Botts could rely on Richards Layton and Skadden, but neither firm would let Baker Botts rely on their advice. *See Post-Trial Op.*, 2021 WL 5267734, at *28, *36, *68. And contrary to Loews' assertion on appeal, Skadden did not determine "that Baker's MAE opinion was reasonable." Appeal Dkt. 12 at 41–42. Skadden advised that the GPGP Board could reasonably rely on the Baker Opinion. Although Loews on appeal described the distinction between a formal opinion and legal advice as Orwellian, that is another difference that practicing lawyers readily understand. That is why many law firms have standing opinion committees that review formal opinions before they are issued. A similar difference exists in the financial world between valuation advice and a formal fairness opinion or insolvency opinion.

[81] Appeal Dkt. 12 at 2.

complained that the court "convicted every lawyer who disagreed with its analysis of acting in 'bad faith.'"[82] That was another mischaracterization.

The *Post-Trial Opinion* did find that Baker Botts acted in bad faith when rendering the Baker Opinion. Making that finding required an extensive analysis; the court did not reach that outcome lightly or cavalierly. That conclusion also rested on a key credibility determination. No matter how nobly Rosenwasser may have conducted himself on other occasions or in other facets of his life, he was an inconsistent witness who did not give credible testimony.

Rosenwasser failed to testify credible on little things. For example:

- At trial, when asked about the discussions about the original drafting of the Call Right in 2005, sixteen years earlier, Rosenwasser acted as if he recalled the events vividly.[83] That delivery does not come through on the cold transcript. For the trial court, his recollection seemed too vivid to be credible, particularly given his lack of recollection on other points.

- At trial, when asked about his first call with Alpert, Rosenwasser claimed it was only a brief and measured conversation in which Alpert asked whether

---

[82] *Id.* at 3; *see id.* at 4 (complaining that the *Post-Trial Opinion* "mounts an indecorous, unjustified attack on the integrity of reputable attorneys"); *id.* at 28 ("the trial court erroneously concluded that the lawyers who rendered the opinion acted inconsistent with their professional responsibilities."); Appeal Dkt. 21 at 2 (asserting that the *Post-Trial Opinion* "looks behind every judgment and accuses everyone involved of bad faith and contrivance"); *id.* at 5 (charging that the trial court's "unsupported flagellation of the bar marks a departure from Delaware custom."); *see id.* at 10 ("The trial court then convicted Baker of 'bad faith' for having answered the question Section 15.1(b) *does ask*—evaluating the 'reasonably likely' impact of tax status on recourse rates at any point 'in the future' based on neutral rate models. Not only did the court ignore *Williams*'s admonition to refrain from second-guessing counsel's judgments, it applied the contrary methodology, drawing unsupported inferences to criticize every aspect of Baker's work.").

[83] *See* Rosenwasser Tr. 41–44.

44

Baker Botts could advise "one way or the other"[84] Alpert had described the matter as urgent, and Rosenwasser acted as if it was urgent by immediately pulling together a big team and having them work over the weekend. Rosenwasser's attempt to downplay the initial call was not credible.

Rosenwasser also failed to testify credibly on big things. For example:

- At trial, when asked about whether the March 15 FERC Actions were final, Rosenwasser said it was "clear to us at the time it was issued in mid-March that it was final."[85] He also said that no one on his team disagreed. But Wagner, Baker Botts' FERC expert, initially did.[86]

- At trial, Rosenwasser claimed that Sullivan, the rate expert Baker Botts hired, agreed that the "Rate Model" was adequate to support the Baker Opinion.[87] Sullivan did not say that. He would only say that the Rate Model constituted a reasonable cost-of-service calculation [88] Sullivan would not go further.[89]

- At trial, when asked about his annotations to the NOPR in which Boardwalk management took positions contrary to the Baker Opinion, Rosenwasser claimed that he was not "reading it that closely" and that he starred or double-

---

[84] *Id.* at 55–56.

[85] *Id.* at 65.

[86] JX 626 at 1. Rosenwasser later admitted that policy statements are not final. *See* Rosenwasser Tr. 141.

[87] *Id.* at 70.

[88] *See* JX 960 at 2 ("[T]he spreadsheet work done by Boardwalk appropriately represents the cost of service for each Boardwalk interstate pipeline, the federal income tax impact at 21%, and the potential reduction in the cost of service for each pipeline if FERC reduces the income tax allowance to 0."); *id.* at 1 ("I have confirmed that Boardwalk has properly used the correct financial and accounting entries in the calculated cost of service for each of its pipelines.").

[89] *See* Sullivan Dep. 151 (testifying that the Rate Model Analysis was "not a recourse rate calculation."); *id.* at 168–69 (testifying that "an indicative rate doesn't mean anything."); *id.* at 101, 126, 149 (testifying that the Financial Data did not attempt to engage with the principles of rate design).

starred passages so that he could "go back and read it again."[90] That was not credible. Really not credible.

- In this deposition, Rosenwasser denied that Baker Botts provided Loews any commitment on April 20, 2018. Instead, he claimed that Baker Botts gave Loews an indication that it was "more likely than not" that Baker Botts could deliver the Legal Opinion.[91] That testimony was not credible. Baker Botts made clear that it was prepared to deliver the Legal Opinion if asked.[92]

In addition, the record showed Rosenwasser not being candid while working on the

Baker Opinion.

- When seeking advice from Richards Layton, Rosenwasser told them that a FERC rate expert had modeled the effect of the March 15 FERC Actions on Boardwalk's rates.[93] That was not true. The rate expert (Sullivan) had made clear that the Financial Data was only a cost-of-service model, not a rate-making analysis.[94] and testified in this action that the so-called Rate Model Analysis was "not a recourse rate calculation."[95]

- When seeking advice from Richards Layton, Rosenwasser told them that the rate expert's analysis showed a "decrease of 12.19% on top line revenue" for Texas Gas, an "11.70% decrease" for Gulf South, and a "15.62% decrease" for Gulf Crossing.[96] That was not true. Those figures would only translate into a comparable effect on topline revenue if Boardwalk's subsidiaries charged recourse rates for a high percentage of their volume, which they did not.

---

[90] Rosenwasser Tr. 82–83.

[91] Rosenwasser Dep. 122–23, 128–29, 257–82.

[92] *See* JX 1234 at 2; Grossman Dep. 76–77.

[93] JX 975.

[94] JX 960 at 2.

[95] Sullivan Dep. 151; *accord id.* at 101–02, 118, 150–51, 168–69; *see id.* at 120 (testifying to additional steps involved in ratemaking that Johnson did not analyze).

[96] JX 975; *see also id.* ("top line revenue impact – excess of 10% impact").

- When seeking advice from Richards Layton, Rosenwasser said that the FERC rate expert projected that EBIT would decrease by 21–22% and distributable cash flow by "closer to 25%."[97] That was not true. The rate expert had not addressed the effect on EBIT or distributable cash flow.[98]

The contemporaneous record also showed Rosenwasser succumbing to Alpert's pressure. For example, he agreed that for purposes of rendering the Opinion of Counsel, the "most important thing has happened" and that "we're already there,"[99] despite the contrary view of the team's FERC expert.[100] And he caved in to Alpert's pressure to deliver the Preliminary Opinion of Counsel without the firm chairman's signoff.[101] The trial court viewed those instances as providing insight into how Rosenwasser approached his assignment, not the only times when he gave in.

The *Post-Trial Opinion* considered Rosenwasser's credibility problems as part of its multi-factor analysis of the Baker Opinion, including its counterfactual

---

[97] *Id.*; *see also id.* ("21% decline in net income" and "even higher in distribution").

[98] Sullivan Dep. 140–42 (discussing final Financial Data in JX 1398); *see also id.* at 141 ("Q: 'Did you offer an opinion regarding the calculation of DCF, EBITDA or EBIT?'; A: 'I do not believe I did specifically cite to EBITDA, EBIT or the DCF.'").

[99] JX 646 at 5.

[100] *See, e.g.*, JX 626 (explaining that the March 15 FERC Actions were not final and would not have an effect on Boardwalk's rates); JX 1502 at 10 ("FERC could choose in its discretion to change the Proposed Policy."); JX 1949 at 2 ("Important details of implementing the Proposed Policy require clarification, and as a result our understanding regarding the implementation of the Proposed Policy could prove to be incorrect.").

[101] *See Post-Trial Op.*, 2021 WL 5267734, at *35–36.

assumptions and counterfactual factual assertions. The *Post-Trial Opinion* therefore found that the Baker Opinion was not rendered in good faith.

The *Post-Trial Opinion* did not find that Skadden acted in bad faith. To the contrary, Jennifer Voss, a partner in Skadden's Delaware office, stood out as the most careful, thoughtful, and independent legal voice in the record. Mike Naeve, a former FERC Commissioner, also stood out as an independent voice. And Richard Grossman stood his ground in ways Rosenwasser did not, first by refusing to give an opinion on whether the March 15 FERC Actions constituted an MAE, and later by refusing to permit Baker Botts suggest in any way that relied on Skadden's view.[102]

Skadden's interactions with Alpert also illustrated how forceful and demanding Alpert could be. According to Alpert, Skadden "'fell into line' but he '[r]eally had to beat on them.'"[103] Alpert had planned to use Skadden for any litigation challenging the exercise of the Call Right, but based on Skadden's resistance to his wishes, Alpert decided that he would "look to other firms re potential litigation."[104] The trial court did not believe that Rosenwasser exhibited Grossman's willingness to push back.

---

[102] *Id.* at *36–37.

[103] *Id.* at *36 (quoting JX 1136 at 1).

[104] *Id.* (quotation marks omitted) (quoting JX 1136 at 1).

The *Post-Trial Opinion* did not find that Richards Layton acted in bad faith. Rosenwasser misled the Richards Layton team about the operative facts.[105] Later, when seeking their advice on the Acceptability Condition, Alpert both pressured them and failed to mention that the General Partner had already taken an action that Richards Layton unknowingly advised "would be a difficult fact to overcome in any future litigation."[106] Richards Layton did not find out about the event until discovery in this case.

The *Post-Trial Opinion* did not find that Davis Polk & Wardwell or Vinson & Elkins acted in bad faith. Both worked on the Potential Exercise Disclosures. The *Post-Trial Opinion* explained how Alpert pushed both firms to refer to an effect on revenues, not on rates, just as he had done with the original Boardwalk press release.[107] The *Post-Trial Opinion* also explained that Ramey Layne of Vinson &

---

[105] *See Post-Trial Op.*, 2021 WL 5267734, at *34. Loews argued on appeal that "Baker engaged RLF, who, after undertaking further research, agreed." Appeal Dkt. 12 at 18. Richards Layton relied on misinformation from Rosenwasser and gave its advice less than twenty-four hours after Rosenwasser called. And Richards Layton only advised that the "[b]etter [r]eading" was to "look [at] rates more, not effects." JX 1007 at 1. The firm also cautioned that a Delaware court would "construe ambig[uity] ag[ai]nst [the] drafter." *Id.* Only after Richards Layton took that position did Baker Botts clarify that that their rate expert had not analyzed the Revised Policy's effect on Boardwalk's rates. Instead, the analysis considered "Hypothetical Rates." *Id* (emphasis removed). Notes taken by a Baker Botts partner reveal that everyone focused on the core issue: There would be "no actual change—no effect yet screw min[ority]." *Id.* That was obviously a "challenging fact." *Id. See generally Post-Trial Op.*, 2021 WL 5267734, at *33–34.

[106] *Id.* at *34 (quoting JX 1225 at 3).

[107] *Id.* at *39–40.

49

Elkins advised the GPGP Board, noting that he had the most pro-Loews view on that issue and that he did not seem to have conducted any analysis in writing and appeared to conflate separate issues under the Partnership Agreement.[108] Those interactions provided additional illustrations of how Alpert used multiple outside law firms to achieve his goals. The *Post-Trial Opinion* did not question either firm's good faith.

More generally, Loews seems to believe that no one should ever consider that an attorney at a big firm might engage in motivated reasoning or otherwise act improperly. On behalf of elite, big-firm lawyers everywhere, Loews objects to the possibility that elite lawyers could rationalize as right what is personally beneficial.

Those claims equate to assertions that big firm lawyers are inhuman. The scholarship on these points goes back over three decades and is no longer subject to meaningful dispute.[109] Big firm lawyers *are* subject to the same pressures and

---

[108] *Id.* at *45.

[109] *See* Donald C. Langevoort, *Where Were The Lawyers? A Behavioral Inquiry Into Lawyers' Responsibility for Client's Fraud*, 46 Vanderbilt L. Rev. 75, 90–106 (1993) [hereinafter *Where Were The Lawyers*]. Looking backwards in 2020, Langevoort described this article as "[t]o my knowledge, . . . the first article to apply social cognition research to the professional responsibilities of corporate lawyers." Donald C. Langevoort, *Gatekeepers, Cultural Captives, or Knaves?: Corporate Lawyers Through Different Lenses*, 88 Fordham L. Rev. 1683, 1684 (2020) [hereinafter *Corporate Lawyers*]. As of 2020, he could state that "work in psychology and behavioral economics is regularly invoked by scholars writing about lawyers' professional responsibility, corporate and otherwise." *Id.* Although debate over the details persists, the big principles are largely settled. They also accord with a layman's intuition. For example, while academics may talk about slippery slopes, "armchair philosophers have long understood that the road to hell is not only paved

cognitive biases as other humans, and perhaps especially so. Professor Donald Langevoort, a leading scholar in this area, explains "that various cognitive (and cultural) biases lead many lawyers—including, and maybe even especially, elite ones—to deflect, normalize, and rationalize actions that are either illegal or unethical without compromising their internal self-image as good, responsible people and good, responsible lawyers."[110] Scholars have also explored how the pressures of modern big firm law practice increase the risk of lawyer wrongdoing, citing factors such as greater competition among law firms, the loss of durable client relationships between corporations and their outside counsel, the increasing extent to which big firm corporate lawyers act as transactional specialists, and the overall shift in power from big firms to in-house counsel.[111]

---

with good intentions but starts in small, often unconscious steps that gradually grow larger and harder to stop." *Id.* at 1686.

[110] *Corporate Lawyers*, *supra* note 109, at 1685; *see also Where Were The Lawyers, supra* note 109, at 90–106.

[111] *E.g.*, Dana A. Remus, *Confidence Breach: A Breakdown in Professional Self-Regulation*, 92 Tex. L. Rev. 1599, 1608 (2014) (reviewing Tanina Rostain & Milton C. Regan, Jr., *Confidence Games: Lawyers, Accountants, and the Tax Shelter Industry* (2014)) ("Scholars and commentators have documented how and why the growing focus on profit maximization has led many firm lawyers, in a variety of practice areas, to make unethical choices and to engage in unethical conduct."); Robert K. Vischer, *Big Law and the Marginalization of Trust*, 25 Geo. J. Legal Ethics 165, 174–87 (2012) (discussing pressures on attorneys that can lead to improper behavior, including globalization, the disaggregation of legal services, the rise of in-house counsel, the decline of self-regulation, multi-disciplinary practice, and Big Law culture); John M. Conley & Scott Baker, *Fall from Grace or Business As Usual? A Retrospective Look at Lawyers on Wall Street and Main Street*, 30 L. & Soc. Inquiry 783, 817 (2005) (concluding from a survey of forty years of empirical studies that lawyers in large

That means high status lawyers can get themselves into messes.[112] In the 1970s, big firm lawyers were the subject of the famous (or infamous, depending on your view) SEC enforcement involving National Student Marketing Corporation and National Telephone Company.[113] A decade later, big firm lawyers were at the heart of the savings and loan crisis, including the big firm lawyers who advised Lincoln Savings & Loan.[114] A decade later, the big firm lawyers who delivered true-sale opinions to Enron and then conducted an unsatisfactory internal investigation found themselves at the heart of that scandal.[115] Big firm were also involved in the stock

firms cope with demanding clients and intense competition that can produce unethical behavior).

[112] Taking an example outside of corporate law, consider Watergate. The scandal resulted in disciplinary proceedings against twenty-nine lawyers, with disciplinary action taken against at least eighteen. President Nixon was a New York lawyer and disbarred for his role in the scandal. *See generally* Laurel A. Rigertas, *Post-Watergate: The Legal Profession and Respect for the Interests of Third Parties*, 16 Chap. L. Rev. 111, 115–24 (2012).

[113] *See* John Coffee, *Gatekeepers* 207–13 (2006).

[114] *Id.* at 213–14. *See generally* William H. Simon, *The Kaye Scholer Affair: The Lawyer's Duty of Candor and the Bar's Temptations of Evasion and Apology*, 23 Law & Soc. Inquiry 243 (1998).

[115] Coffee, *supra* note 113, at 213–14; Rigertas, *supra* note 112, at 140–42.

option backdating and mutual fund market timing scandals in the 2000s.[116] More examples could be cited.[117]

Each of these situations was complex. And much of the academic commentary deals with ethics, rather than the issue of bad faith. The point is not that Baker Botts' actions map directly onto any of these scenarios. The point is rather that top-flight lawyers at big law firms are human, just like the rest of us. Humans can act in bad faith. The *Post-Trial Opinion* found that the humans at Baker Botts acted in bad faith when they rendered the Baker Opinion.

### d. Claiming The Trial Court Did Not Interpret "Maximum Applicable Rates" As "Recourse Rates"

Another argument Loews advanced on appeal was to claim that the *Post-Trial Opinion* committed reversible error through "its analysis of the term 'maximum applicable rate.'"[118] Contrary to how Loews portrayed the *Post-Trial Opinion*, the trial

---

[116] *See* John C. Coffee, Jr., *The Political Economy of Dodd-Frank: Why Financial Reform Tends to Be Frustrated and Systemic Risk Perpetuated*, 97 Cornell L. Rev. 1019, 1044 (2012) (noting that both the stock option backdating and mutual fund market timing "deeply implicated attorneys."); Patricia Dechow & Samuel Tan, *How Do Accounting Practices Spread? An Examination of Law Firm Networks and Stock Option Backdating* (Dec. 17, 2019) (providing statistical analysis indicating spread of option-backdating through law firm networks), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2688434.

[117] *E.g.*, Ronald D. Rotunda, *Why Lawyers Are Different and Why We Are the Same: Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior-in-House Ethics Counsel, Bill Padding, and in-House Ethics Training*, 44 Akron L. Rev. 679, 685–91 (2011) (listing examples).

[118] Appeal Dkt. 12 at 32.

court accepted Baker Botts' view that maximum applicable rates meant recourse rates. The *Post-Trial Opinion* did not treat that interpretation as a factor supporting bad faith. *The Post-Trial Opinion* instead considered that Baker Botts did not account for the implications of the recourse-rate interpretation when rendering its opinion.[119]

Thus, the *Post-Trial Opinion* considered as factors in the bad faith analysis that (i) Baker Botts could not render an opinion on the effect of the March 15 FERC Actions on recourse rates without taking into account rate case risk, (ii) Boardwalk management and the Baker Botts' rates expert did not see any meaningful rate case risk, and (iii) the Baker Opinion failed to openly identify its assumptions that each Boardwalk subsidiary would face and lose a rate case with the outcome determined by single-issue ratemaking.[120] The *Post-Trial Opinion* also considered that although the Baker Opinion said it considered recourse rates, it actually considered hypothetical indicative rates and made the unexpressed assumption that the two were the same.[121]

It is true that the *Post-Trial Opinion* discussed the potential ambiguity in the term maximum applicable rates and how the doctrine of *contra proferentem* would

---

[119] *Post-Trial Op.*, 2021 WL 5267734, at *58–61.

[120] *Id.* at *58–59.

[121] *Id.* at *60.

operate in case of ambiguity.[122] That was an issue Baker Botts addressed, as did other law firms that Loews engaged. But the *Post-Trial Opinion* did not make these points to argue that Baker Botts acted in bad faith by getting that interpreting issue wrong. The *Post-Trial Opinion* discussed those aspects of the case to relay how the Baker Opinion evolved.

For purposes of bad faith, the *Post-Trial Opinion* accepted Baker Botts' decision to interpret maximum applicable rates to mean recourse rates, then examined whether Baker Botts accepted the implications of that interpretation. Baker Botts did not, resulting in the Baker Opinion addressing "the highest rates that FERC would allow Boardwalk to charge in a hypothetical world that assumed there was a full market for the pipelines' services."[123] That was not the recourse rate. What the *Post-Trial Opinion* viewed as a significant factor in the bad faith analysis was "the unstated counterfactual assumption that indicative rates were the same as recourse rates."[124]

---

[122] *See id.* at *23, *60–61 (discussing sources of ambiguity); *see also* JX 1743 ("Court Report") ¶¶ 152–55, 157–69; JX 1756 ("Court Rebuttal") ¶¶ 11–17; Rosenwasser Dep. 365; JX 637; JX 781 at 1; JX 800 at 2; JX 1437; JX 1522 at 4.

[123] *Post-Trial Op.*, 2021 WL 5267734, at *61 (citing JX 646 at 3–4 ("'Max hypothetical rate.' This is not the recourse rate.")); *see also* JX 727 at 2 ("[W]e have provided indicative rates . . . ."); JX 733 at 1 ("theoretical maximum rates"); JX 798 ("[I]t's crystal clear that we're talking hypothetical future max FERC rates."); JX 1007 at 1 ("hypothetical rates").

[124] *Post-Trial Op.*, 2021 WL 5267734, at *61.

### e. The Assertion That The Trial Court Interpreted The Call Right As Requiring A Material Adverse Effect On Boardwalk

Loews also asserted on appeal that "[t]he court theorized, without support, that the call right was meant to operate like a MAE clause in a merger agreement, broadly measuring the impact of regulatory action on Boardwalk's business."[125] That is not true.

To support that assertion, Loews cited the *Post-Trial Opinion's* references to the origins of the Call Right as a business issue. The *Post-Trial Opinion* stated that "Loews wanted to be able to take Boardwalk private again if FERC took regulatory action that would have a material adverse effect on Boardwalk."[126] The trial court did not theorize about that without support. It came from Rosenwasser's testimony.[127]

The *Post-Trial Opinion* discussed the origins of the Call Right as part of the factual background. In the legal analysis, the *Post-Trial Opinion* did not conduct a

---

[125] Appeal Dkt. 12 at 2.

[126] *Post-Trial Op.*, 2021 WL 5267734, at *1; *accord id* at *10–12.

[127] Rosenwasser Tr. 41–42, 47; Rosenwasser Dep. 39–40; *see also* McMahon Tr. 479–80, 544. Rosenwasser also explained that when determining what would constitute a material adverse effect on rates, they considered what effect that "would have to Boardwalk, which obviously is what Loews put that provision in there for." Rosenwasser Tr. 97; *see id.* at 98 ("Because if you think about why was the word 'material,' you know, 'change' in rates in there, it was because of the impact it would have on Boardwalk. And we looked at what that impact was on Boardwalk . . . .").

merger-agreement-style MAE analysis.[128] Over the course of eighteen Westlaw pages, the *Post-Trial Opinion* instead discussed a series of other factors that led ultimately to a finding of bad faith.[129] Those factors included (i) four counterfactual assumptions, (ii) two counter-factual inputs, (iii) examples of motivated reasoning, (iv) Baker Botts' willingness to opine on a complex issue of Delaware law that a leading Delaware law firm and a leading national law firm with a Delaware office would not address, and (v) human dynamics that permeated the situation.[130] That is not an MAE analysis.

In one subsection of the section addressing the Baker Opinion's counterfactual inputs, the *Post-Trial Opinion* cited Loews' original business goal for the Call Right and how it differed from Rosenwasser's syllogism.[131] That was a comparatively small part of the analysis that set up the issues with the analysis of recourse rates discussed previously. That one subpart did not treat the Opinion Condition as requiring the equivalent of a merger agreement MAE.

In another section titled "Other Efforts To Reach The Desired Conclusion," the *Post-Trial Opinion* examined four less monumental but still strained decisions that

---

[128] *Compare Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018); *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14 (Del. Ch. 2001).

[129] *Post-Trial Op.*, 2021 WL 5267734, at *52–71.

[130] *Id.*

[131] *Id.* at *63–65.

Baker Botts made.[132] One of them was what would constitute a material adverse effect on rates. The *Post-Trial Opinion* did not discuss MAE cases like *IBP* or *Akorn.* The *Post-Trial Opinion* only looked for internal consistency. That meant looking at the advice Baker Botts actually received from Richards Layton and Skadden. Neither of those firms provided any written analysis endorsing a reduction as low as 10% as sufficient for an MAE, but Baker Botts did, stating that "an estimated reduction *in excess of ten percent*" would be sufficient.[133] That was not a *de novo* analysis; it evaluated what Baker Botts did against what the firm had been told.

Regardless, the *Post-Trial Opinion* did not turn on that issue. That was only one factor that the court considered. The analysis was "necessarily holistic,"[134] and if there had not been so many factors pointing in the same direction, then the record "would not have been sufficient to support a lack of good faith."[135] The material adverse effect assessment was just one factor. It would not have been significant if it

---

[132] *Id.* at *67–68.

[133] *Id.* at *67 (emphasis in original) (citing JX 1522 at 3).

[134] *Id.* at *71.

[135] *Id.*

stood alone, nor even if it was joined by a few other issues.[136] The claim that the *Post-Trial Opinion* conducted a merger-agreement-style MAE analysis is not correct.[137]

### f.     The Assertion That The Trial Court Reviewed Baker Botts' Reasoning *De Novo*

When pursuing its appeal, Loews repeatedly asserted that the trial court "improperly reviewed Baker's reasoning *de novo*."[138] That too is inaccurate.

---

[136] *Id.* ("If Baker Botts had only stretched once or twice, or made an isolated counterfactual assumption, then it would not be possible to reject the Opinion. Under those circumstances, the court might have disagreed with Baker Botts' assessments, but those disagreements would not have been sufficient to support a lack of good faith.").

[137] In a related point, Lowes asserted on appeal that the trial court "changed the contractual question, deciding that the call right should only ripen if Baker could reasonably conclude that 'real world' effects on Boardwalk's charged rates would materialize within the near term." Appeal Dkt. 21 at 9–10. Reiterating that point, they asserted that the Call Right "does not entail an analysis of near-term business impact" such that "[t]he trial court's chief error in rejecting Baker's opinion was its conclusion that Section15.1(b) required an analysis of near-term business impact." *Id.* at 10 (emphasis removed). And Loews decried "the trial court's unwillingness to accept the language of the LPA, which unambiguously called for a prediction of future impact on maximum applicable rates rather than an assessment of immediate economic impact on Boardwalk." Appeal Dkt. 12 at 27.

Once again, the *Post-Trial Opinion* did not do what Loews claims. The *Post-Trial Opinion* accepted that the Opinion Condition only required a future effect on rates. The problem was that no one could predict any effect on rates. The March 15 FERC Actions were not final, so they could not affect rates that way. Ignoring that problem, two of Boardwalk's subsidiaries met the characteristics where FERC indicated there would be no effect on rates, and for the third, Wagner and the Baker Botts rate expert, Sullivan, agreed that there was no threat of a rate case within the time frame where any reasonable predictions could be made.

[138] Appeal Dkt. 12 at 28; *accord* Appeal Dkt. 21 at 1 (claiming that if "[l]eft unreviewed, the decision will overthrow *Williams* and leave lawyers' opinions subject to hostile *de novo* review whenever a trial court's views differ from those of counsel.");

59

The *Post-Trial Opinion* assessed whether Baker Botts rendered the Baker Opinion in bad faith. Bad faith is a state of mind, and an individual's mental state is not directly observable.[139] "Even after a trial, a judge may need to make credibility determinations about a defendant's subjective beliefs by weighing witness testimony against objective facts."[140] "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications. Objective facts remain logically and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief."[141]

Examining the record and drawing inferences is the only way a trial court can determine whether a party acted in subjective good faith. Here, Baker Botts knew from the outset that Boardwalk's recourse rates were unlikely to decrease in the foreseeable future.

- Baker Botts knew from the outset that Boardwalk's recourse rates were unlikely to decrease as a result of the March 15 FERC Actions.

    o Immediately upon joining the team, a Baker Botts partner and FERC practitioner (Wagner) explained to Loews General Counsel (Alpert)

---

*Id.* (claiming that if not reversed, "[t]he decision will leave lawyers the world over [sic] wondering whether Delaware's courts view them as officers of the court or untrustworthy 'rationalizers'").

[139] *IBEW Loc. Union 481 Defined Contribution Plan & Tr. v. Winborne*, 301 A.3d 596, 619 (Del. Ch. 2023); *ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 1001 (Del. Ch. 2023).

[140] *Allen v. Encore Energy P'rs, L.P.* (*Encore I*), 72 A.3d 93, 106 (Del. 2013).

[141] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014), *aff'd*, No. 399, 2014, 2015 WL 803053 (Del. Feb. 26, 2015).

that, absent further regulatory developments, the March 15 FERC Actions would not have an effect on Boardwalk's rates.[142]

- o Sullivan, the rate expert Baker Botts retained, confirmed why Boardwalk's rates were safe. Two of the three subsidiaries would not face rate cases due to the change in policy and thus were in no danger of having their recourse rates lowered. For the third, Wagner and Sullivan concluded (and told Loews) that there was a low probability of a rate case, much less a loss in a rate case, during the two-year period during which predictions could be made with any degree of confidence.[143]

- To create a basis to give the Opinion of Counsel, Rosenwasser had to craft a syllogism devoid of "any real factual analysis about the effect of the March 15 FERC Actions."[144] That syllogism embodied the very approach that Boardwalk's general counsel and its outside regulatory counsel (Van Ness Feldman) ridiculed as "priceless" and incorrect "1:1 thinking."[145]

  - o To support the syllogism and show a change in cost of service leading to a change of rates, Baker Botts asked for and received from Boardwalk a cost-of-service calculation. That analysis also ignored the potential treatment of ADIT.

---

[142] *Post-Trial Op.*, 2021 WL 5267734, at *20.

[143] *Id.* at *26, *29, *33.

[144] *Id.* at *21.

[145] *Id.* at *64. On remand, Loews wrote misleadingly that "McMahon did not 'ridicule' the Rate Model, but criticized *FERC* for suggesting that a change to the tax allowance without updating any other cost-of-service element would necessarily result in a reduced cost-of-service [sic]." Dkt. 311 at 39. True, and Rosenwasser's syllogism took exactly the same approach. So when McMahon wrote "[t]hat was a priceless statement taxes go down COS goes down this is going to be a train wreck," JX 575 at 2, he was describing the approach that Baker Botts took. And when a Van Ness lawyer resulted with "[t]hat is the just [sic] type of 1:1 thinking that we were trying to explain is not the case," *id.*, he was addressing precisely the same error that Rosenwasser made in his syllogism.

- Sullivan, the rate expert Baker Botts hired, refused to sign off on the cost-of-service calculation as applying to rates.[146]

- Wagner informed the rest of the Baker Botts team about Sullivan's position. Wagner understood that indicative rates in the Boardwalk analysis were "not the recourse rate."[147]

- In the back-up materials and in the Baker Opinion, Baker Botts misrepresented that Sullivan had signed off on the Financial Data as a rates analysis, rather than a cost-of-service analysis.[148]

- A Baker Botts partner noted that under the analysis supporting the Baker Opinion, there "would be 'no actual change—no effect yet screw min[ority],'" which was "obviously a 'challenging fact.'"[149]

- Baker Botts knew that rates can only change after a rate case, but after an early draft of the Baker Opinion expressly assumed that Boardwalk would act against its own interests by filing rate cases to lower the rates they charged their customers, subsequent drafts scrubbed that language, maintained the absurd assumption, and simply claimed that recourse rates would change "without addressing how those rates would come about."[150]

- Baker Botts knew that the treatment of ADIT would change the analysis substantially but did not wait for FERC to address the treatment of ADIT

---

[146] *Post-Trial Op.*, 2021 WL 5267734, at *32.

[147] *Id.* at *61.

[148] *See* JX 1502 at 11 (Rosenwasser's backup memorandum) ("We examined the Financial Data together with a rate consultant that we engaged to assist us. Nothing came to our attention that indicate [sic] a material error in the Financial Data or that the Partnership had not prepared the Financial Data in good faith in a manner responsive to our request for information."); *id.* at 21 (stating that "[w]e reviewed the information . . . with the assistance of a consulting firm engaged by us" and "nothing came to our attention that caused us to believe that there was an error in the methodology used in deriving the information").

[149] *Post-Trial Op.*, 2021 WL 5267734, at *34.

[150] *Id.* at *30.

and did not model any methods other than the Reverse South Georgia approach.

- o Rosenwasser's backup memorandum does not even mention ADIT, let alone explain how Baker Botts could correctly assess the effect of the March 15 FERC Actions before a final decision on ADIT.[151]

- o Rosenwasser knew that Boardwalk publicly admitted that the treatment of its $750 million ADIT balance would impact any rate analysis "substantially" and that Boardwalk publicly admitted that it could not correctly assess the cost-of-service impact of the March 15 FERC Actions until the ADIT issue was resolved. (let alone any potential rate impact) prior to the resolution of the treatment of ADIT.

- In its public comments to FERC, Boardwalk emphasized it was "misleading" to equate a change in cost of service stemming from the loss of the income tax allowance with a "rate reduction" because a cost-of-service change has "little bearing" on whether or not a rate reduction will occur, and doing so would violate FERC's policy against single-issue ratemaking.[152]

- Boardwalk personnel knew that the effect on rates could not be analyzed until FERC addressed the treatment of ADIT.[153]

- Boardwalk publicly admitted that it could not "correctly assess" the cost-of-service impact of the March 15 FERC Actions (let alone any potential rate impact) before the resolution of the treatment of ADIT.[154]

- The Loews executives who insisted on the Baker Opinion knew from the outset that Boardwalk's recourse rates were unlikely to decrease as a result of the March 15 FERC Actions.

---

[151] *See* JX 1502.

[152] *Post-Trial Op.*, 2021 WL 5267734, at *64.

[153] *Id.* at *36.

[154] JX 1139 at 14.

- Loews' in-house counsel recognized that the analysis in the Baker Opinion only worked for "hypothetical future max FERC rates" where the "answer was baked into the assumption" and not "in the real world."[155]

Based on these points and the record as a whole, the trial court concluded that Baker Botts had not rendered the Baker Opinion in good faith. If a law firm can claim that a material adverse effect on recourse rates is likely when everyone knows the opposite is true, then an opinion becomes a blank check.

As part of its analysis, the *Post-Trial Opinion* did evaluate aspects of Baker Botts' determinations. The Delaware Supreme Court has made clear that a trial court can consider how extreme a particular decision appears to be when assessing bad faith. If the evidence shows that taking a particular course of action was extreme, then those facts are "logically relevant" to making a finding of subjective bad faith.[156] The high court addressed this point in a decision interpretating a limited partnership agreement that, like the agreement in this case, eliminated fiduciary duties and left only contractual obligations. The trial court had posited that the quality of a decision was "not relevant" when determining a party's good faith.[157] The Delaware Supreme Court reversed, emphasizing that such an assertion "overstated the potency of the

---

[155] *Post-Trial Op.*, 2021 WL 5267734, at *61.

[156] *Encore I*, 72 A.3d 93, 107 (Del. 2013).

[157] *Id.*

64

subjective good faith standard" and could render transactions "virtually unchallengeable."[158]

The Delaware Supreme Court's approach comports with widely accepted scientific learning about the theory of mind.

> While "mind reading" might sound like a mentalist magic trick, for cognitive scientists it refers to the very pedestrian capacity we all have for figuring out what another human being is thinking. . . . Other people's minds are opaque to us, so we cannot observe them directly. And yet, when someone walks toward the water fountain on a hot day, we know she wants a drink. When someone yelps after stubbing her toe, we know she feels pain. When someone aims an arrow at a target, we know she intends to hit it. We take in observable data about a person and infer something about her unobservable mental life.[159]

"We gather two types of observable information—what a person did and the circumstances in which he did it—and triangulate to a person's unobservable mental states."[160]

Conducting a detailed review is not the same as *de novo* review. As noted in the prior section, the analysis that led to the bad faith finding covered eighteen Westlaw pages. The discussion was so detailed, not because the trial court reviewed the Baker Opinion *de novo*, but because finding bad faith is not easy. In this case, it required a combination of many factors, including credibility assessments, for the

---

[158] *Id.* at 106–07.

[159] Mihailis Diamantis, *How to Read a Corporation's Mind, in The Culpable Corporate Mind* 222–23 (Elise Bant ed., 2023) (footnote omitted).

[160] *Id.* (footnote omitted).

trial court to make that finding.[161] The *Post-Trial Opinion* evaluated Baker Botts'

express assumptions, implicit assumptions, and conclusions to determine whether

they were explicit and internally consistent. The *Post-Trial Opinion* also examined

how extreme they were, recognizing that if there was a credible and rational basis to

support them, then the Baker Opinion would stand.

The *Post-Trial Opinion* found that Baker Botts made a series of counterfactual

assumptions, one explicit and the others implicit. For example, the explicit

assumption was that the Revised Policy was final and would not be directly or

indirectly revised. The *Post-Trial Opinion* analyzed that assumption and concluded

it was contrary to known facts, including (i) the non-final nature of the agency actions,

(ii) the industry response to the agency actions, (iii) Wagner's explanation of the

non-final nature of the policy, (iv) comments by Boardwalk's executives, and

(v) Rosenwasser's own markup of Boardwalk's comments on the NOPR.[162] Claiming

the March 15 FERC Actions were final and would not change was like taking the

halftime score of a basketball game and assuming that the team in the lead would

not change. If one team had a big lead at halftime, then that assumption might turn

out to be correct, but the halftime score still would not be final.

The *Post-Trial Opinion* conducted a similar review and analysis of three other

counterfactual assumptions and two factual inputs, then reviewed other efforts in

---

[161] *See Post-Trial Op.*, 2021 WL 5267734, at \*53–71 (Del. Ch. Nov. 12, 2024).

[162] *Id.* at \*56–58.

which Baker Botts had to engage to reach the desired conclusion.[163] That was not *de novo* review. It was the type of review necessary to support a finding of bad faith.

## 2. The *Supreme Court Opinion*

The Delaware Supreme Court issued two decisions. All five justices joined in the *en banc Supreme Court Opinion*.[164] Two justices both joined in the *Supreme Court Opinion* and issued a concurring opinion (the "*Concurring Opinion*").[165]

The *Supreme Court Opinion* acknowledged the finding that Baker Botts rendered a contrived opinion in bad faith, but chose "a different path to decide this appeal."[166] The *Supreme Court Opinion* focused on the Acceptability Condition, a provision that protected the General Partner with a conclusive presumption of good faith if the General Partner reasonably relied on an expert (the "Conclusive Presumption Provision"), and a provision exculpating the General Partner for action taken in good faith.

The justices held as a matter of law that (i) the Sole Member of the General Partner was the proper party to make the acceptability determination and (ii) the

[163] *See id.* at *58–68.

[164] *See Supr. Ct. Op.*, 288 A.3d 1083, 1083–123 (Del. 2022).

[165] Justice Valihura authored the *Concurring Opinion*, joined by then-Judge LeGrow, sitting by designation. Judge LeGrow has since become Justice LeGrow, so the *Concurring Opinion* represents the views of two concurring justices. *See Supr. Ct. Op.*, 288 A.3d 1083, 1123–36 (Del. 2022) (Valihura, J. & LeGrow, J., concurring) [hereinafter *Concurring Opinion*].

[166] *Supr. Ct. Op.*, 288 A.3d 1083, 1118 (Del. 2022).

Sole Member "reasonably relied on Skadden's opinion" about the sufficiency of the Baker Opinion.[167] Given those findings, the Conclusive Presumption Provision meant that the Sole Member and the General Partner were conclusively presumed to have acted in good faith, and the presumption of good faith meant that "the general partner and others were exculpated from damages under the Partnership Agreement."[168]

The high court remanded for further proceedings consistent with its opinion.

### 3.     The *Concurring Opinion*

The Concurring Justices joined in the *Supreme Court Opinion* but wrote separately because they would have gone further. They would have made different factual findings and, ultimately, reversed the finding that the Baker Opinion was not rendered in good faith, which they called the "Breach Holding."[169] The Concurring Justices also expressed a fear that if not reversed, "[t]he Breach Holding has the potential to fundamentally alter the legal environment in which opinions of counsel are prepared."[170]

---

[167] *Id.* at 1088.

[168] *Id.*

[169] *Concurring Op.*, 288 A.3d. at 1123.

[170] *Id.* at 1124; *accord id.* (stating that the trial court "substituted its own legal analysis of Section 15.1(b)'s analytical framework and then measured Baker's work product against that standard").

### a. The *Concurring Opinion*'s Analysis

The *Concurring Opinion* adopted Loews' argument that the *Post-Trial Opinion* "viewed the Opinion through a *de novo* lens, instead of the more deferential standard set forth in *Williams*."[171] This decision has explained when addressing Loews' arguments that the trial court did not do that.

The *Concurring Opinion* viewed the *Post-Trial Opinion*'s factual findings as undeserving of deference because "many of the key findings are a function of the court's misapplication of *Williams* and its rejection of Baker's model."[172] Speaking subjectively, that is not what the trial court did. Rather than picking an outcome and reasoning backwards to find facts supporting that outcome, the trial court started by finding facts. The trial court then analyzed the Baker Opinion in light of those facts. The trial court subjectively believed that it was applying *Williams* by considering whether Baker Botts acted in bad faith.

Having asserted that a deferential factual review was not warranted because of how the trial court was thought to have proceeded, the Concurring Justices weighed aspects of the evidentiary record differently than the trial judge. For example:

- The *Concurring Opinion* acknowledged Boardwalk's public comments on the regulatory process were "not favorable to the Appellants" and demonstrated that "Boardwalk was telling its regulators and the market one thing, while taking a different position with its counsel in deciding the

---

[171] *Id.*

[172] *Id.* at 1124.

Opinion."[173] The *Concurring Opinion* nevertheless treated the evidence differently by interpreting the comments as only addressing near-term rather than long-term effects.[174]

- The *Concurring Opinion* acknowledged that "the evidence suggests that Loews' Alpert 'threatened to fire Skadden,' beat them up until they fell in line, and sidelined them by terminating their representation of GPGP."[175] The *Concurring Opinion* also acknowledged that "the record amply supports the conclusion that Loews was an aggressive client."[176] The Concurring Justices nevertheless opted to credit the "clear testimony from the lead corporate partner that the firm's advice and independence were not affected by any such behavior" and that "the firm did not experience pressure or 'bullying' from its client."[177]

- The *Concurring Opinion* acknowledged the evidence that Loews exercised pressure on Baker Botts,[178] but discounted that evidence based on the "250 pages of support underlying the conclusions reached in the Opinion" and the assessment that the record "does not suggest blind obedience to client demands."[179] The *Concurring Opinion* also cited the involvement of Richards Layton and Skadden.[180] Because of the different weight they gave to the evidence, the Concurring Justices ultimately "d[id] not agree with the trial court that Loews pressured its lawyers into reaching a certain result."[181]

---

[173] *Id.* at 1134.

[174] *Id.* at 1134–35.

[175] *Id.* at 1125.

[176] *Id.* at 1125.

[177] *Id.*

[178] *Id.* at 1135.

[179] *Id.*

[180] *Id.* at 1135–36.

[181] *Id.* at 1136.

- The *Concurring Opinion* accepted Loews' assertion that the plaintiffs' FERC expert "testified at trial that the assumptions employed by Baker in its analysis were reasonable."[182] The chart Loews presented did not support that assertion.

  - The plaintiffs' expert agreed that the Revised Policy did not change, not that it was reasonable at the time Baker Botts rendered its opinion to assume that the Revised Policy was final. The *Post-Trial Opinion* gave weight to the latter.[183]

  - The plaintiffs' expert agreed that maximum applicable rates are the same as recourse rates, and the *Post-Trial Opinion* accepted that. But the plaintiffs' expert did not agree that recourse rates are the same as hypothetical indicative rates. The *Post-Trial Opinion* gave weight to the latter observation.[184]

  - The plaintiffs' expert agreed that it was not unreasonable to assume FERC would adopt the Reverse South Georgia Method. She did not agree that how FERC would treat ADIT was known. The *Post-Trial Opinion* gave weight to the latter observation.[185]

  - In any event, the *Post-Trial Opinion* did not find that the Baker Opinion was rendered in bad faith because the assumptions supporting the cost-of-service analysis were unreasonable. One factor that contributed to the *Post-Trial Opinion*'s finding of bad faith was that the Baker Opinion obtained a cost-of-service analysis but characterized it as a rate model analysis and relied on it to measure a change in rates without taking into account rate case risk or the problem of single-issue ratemaking.

- The *Concurring Opinion* adopted Loews assertion that "the Plaintiffs' representative even agreed that Baker's reading of the contractual language was the correct reading."[186] That statement refers to an email in

---

[182] *Id.* at 1124.

[183] *Post-Trial Op.*, 2021 WL 5267734, at *55–56 (Del. Ch. Nov. 12, 2024).

[184] *Id.* at *60.

[185] *Id.* at *62.

[186] *Concurring Op.*, 288 A.3d at 1125.

71

which a Bandera trader speculated that a regulatory change would be sufficient even if it "won't affect rates until 1,000 years from now."[187] That is not a reasonable interpretation of the Call Right. When a contract is silent on the time for performance, a court can imply a reasonable period-of-time term.[188] Positing an effect a millennium in the future would not be reasonable.[189]

- The *Concurring Opinion* adopted Loews' argument that "two law firms previously engaged by Plaintiffs agreed that the Call Right had been triggered."[190] Friedlander & Gorris and Bernstein Litowitz were the original counsel for two stockholders and a putative class; they were replaced by the current plaintiff and its counsel. And while they did argue that the Call Right had been triggered, they did so in the context of presenting a settlement for approval. Trial judges have seen all too many cases in which plaintiffs play up their claims while litigating them, only to downplay their strength at the settlement stage. The trial court gave little weight to the statements by former plaintiffs' counsel in that context.[191]

---

[187] JX 1290 at 2.

[188] *Martin v. Star Pub Co.*, 50 Del. 181, 190 (1956); *see also Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1034 (Del. Ch. 2008).

[189] Rosenwasser testified at trial that the Opinion Condition included the phrase "reasonably likely in the future" because "Loews wanted to make clear the adverse impact didn't have to happen before they could do the call-up . . . . They wanted to be clear . . . that they weren't talking about something that was occurring right then or immediately going to happen." Rosenwasser Tr. 47. That is very different than contemplating an effect one thousand years in the future.

[190] *Concurring Op.*, 288 A.3d at 1124.

[191] *See, e.g.*, Bruce L. Hay, *The Theory of Fee Regulation in Class Action Settlements*, 46 Am. U. L. Rev. 1429, 1450 (1997) (explaining that when seeking settlement approval "[t]he defendant and class counsel have a joint incentive to minimize the court's estimate of the value of the class's claims and to maximize the court's assessment of the amount being paid to the class"); *see also* Joel Edan Friedlander, *How* Rural/Metro *Exposed the Systemic Problem of Disclosure Settlements*, 40 Del. J. Corp. L. 877, 904 (2016) (discussing plaintiffs describing the weakness of their claims to support settlements, as well as cases where other counsel took over the case and achieved a recovery). To be sure, the author is the lead partner

- The *Concurring Opinion* stated that Richards Layton "agreed with Baker that recourse rates meant 'maximum applicable rates.'"[192] As discussed above, the *Post-Trial Opinion* accepted Baker Botts' interpretation of maximum applicable rates as recourse rates, but faulted Baker Botts for not sticking with the implications of that interpretation. Richards Layton, however, addressed a different issue: whether to consider rates or business effects. Richards Layton advised the "[b]etter [r]eading" was to "look [at] rates more, not effects."[193] In response, Baker Botts told Richards Layton that it was looking at "Hypothetical Rates" and that there could be "no actual change" in recourse rates.[194]

- Finally, the *Concurring Opinion* cited the fact "Skadden opined that Baker's Opinion was acceptable."[195] Agreed. The question was how much weight to give to Skadden's advice.

If the findings in the *Concurring Opinion* had been the trial court's findings, then they plainly would pass muster under a clearly erroneous standard. They represent a different weighing of the evidence than how the trial court weighed it, but no one could say they were clearly erroneous.

Here, the trial court weighed the evidence differently. The trial court held a four-day trial and saw fourteen witnesses testify live. Seeing and hearing a person live can make a big difference. Reading Shakespeare is one thing; seeing a company perform is another. Reading *The Hill* is one thing; seeing Amanda Gorman present

---

of Friedlander & Gorris, and the court acknowledged that the firms involved were not usually ones who sued and quickly settled. Dkt. 30 at 25–26.

[192] *Concurring Op.*, 288 A.3d at 1125.

[193] JX 1007 at 1.

[194] *Id.*

[195] *Concurring Op.*, 288 A.3d at 1125.

73

the poem is another. Reading a job applicant's cover letter and resume is one thing; interviewing the job applicant is another. Seeing can even add immeasurably to hearing. Listening to *Hamilton* is one thing; watching the performance is another.

When cases go to trial, there are invariably at least two plausible ways to view the evidence. In challenges to heavily lawyered transactions, the transaction proponents typically have an account that is shorter and tighter, relies on formal documents and the proponents' testimony, and reads well on paper. The party challenging the transaction advances an account that takes longer to unfold, requires drawing inferences from combinations of documents, testimony, and events, and usually needs at least one credibility determination to go its way.

That was the case here. Loews employed half-a-dozen top law firms to button down the formal record. The plaintiffs had to marshal extensive evidence to undermine the formal record, and they needed to impeach the testimony of key witnesses at trial. They succeeded in that effort, most notably with Rosenwasser, but also with other witnesses to a more limited degree. Those credibility determinations played a major role in generating the outcome in the *Post-Trial Opinion*.

It is not surprising that the justices could view the factual record differently than the trial court, because an appellate record differs inherently from a trial court record. On appeal, the parties submitted appendices containing 267 exhibits. At the trial-court level, the parties introduced 1,978 exhibits into evidence. On appeal, no one testified live, and the justices did not have the opportunity to evaluate any witness's credibility. At the trial-court level, eight fact witnesses and six experts

74

testified live. On appeal, the parties argued before the justices for one hour. At the

trial-court level, the trial lasted four days, and the parties presented post-trial

argument for three hours. All else equal, the different dynamics on appeal should

favor the shorter, more direct story over the longer, more involved story.

Notwithstanding the *Concurring Opinion*, this decision adheres to the findings

of fact in the *Post-Trial Opinion*. Over the course of a four-day trial, the plaintiffs

proved their more nuanced account by a preponderance of the evidence.[196]

---

[196] Mark Twain is often credited with saying that history does not repeat, but it rhymes. There have been two other instances in which it seemed to me as if the differences between the trial court record and the appellate record resulted in the two tribunals reaching different assessments about an individual's mental state. In the *CDX* litigation, the defendants had the shorter and more direct story. It relied on formal documents, including board resolutions, and was supported by trial testimony tracking the resolutions. The plaintiff presented a longer and more detailed account that turned on less formal documents like emails. After a three-day trial, the trial court discredited a key witness's testimony, credited the plaintiff's evidence, and found that a valuation determination had not been made in good faith. *See Fox v. CDX Hldgs. Inc.*, 2015 WL 4571398 (Del. Ch. July 28, 2015) (subsequent history omitted). On appeal, the majority held that those findings were not clearly erroneous; the dissent would have made different credibility determinations. *See CDX Hldgs., Inc. v. Fox*, 141 A.3d 1037 (Del. 2016).

More recently, in the *XRI* litigation, the plaintiff offered the shorter and more direct story. The defendants offered a longer story that turned on the extent to which one of the plaintiff's key representatives had been involved in the transaction. The defendants' story also depended on successfully impeaching the testimony of that key representative. The trial court credited the longer story. While not reversing on appeal, the justices asked a series of questions suggesting that they regarded the shorter story as more persuasive. The trial court tried to answer those questions on remand. *Compare Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 938–39 (Del. 2023)

### b. The Policy Issues

After weighing the evidence differently and proposing different factual findings, the *Concurring Opinion* expressed concern that the "[t]he Breach Holding has the potential to fundamentally alter the legal environment in which opinions of counsel are prepared."[197] The *Supreme Court Opinion* echoed that statement by observing that the *Concurring Opinion* raised "important concerns about the Court of Chancery's analysis of the Baker Botts Opinion."[198]

As the author of the *Post-Trial Opinion*, I not surprisingly have a different take. First, the *Post-Trial Opinion* did not simply follow the plaintiffs' lead, make a credibility-based finding of bad faith, and stop there. Credibility certainly played a significant role, but the *Post-Trial Opinion* grounded the standards it used to evaluate bad faith with citations to standard resources that opinion givers follow.[199]

---

(asking questions) *with XRI Inv. Hldgs. LLC v. Holifield*, 2024 WL 3517630, at *14–17 (Del. Ch. July 24, 2024) (attempting to answer those questions).

Experienced lawyers know that the trial and the appeal are different animals. The materially different nature of the record is one of many reasons why that is so.

[197] *Concurring Op.*, 288 A.3d at 1124.

[198] *Supr. Ct. Op.*, 288 A.3d 1083, 1117 (Del. 2022).

[199] *See Post-Trial Op.,* 2021 WL 5267734, at *53 n.16 (citing Restatement (Third) of the Law Governing Lawyers §§ 50, 51, 95, (Am. L. Inst. 2000), Westlaw (database updated June 2024); Donald W. Glazer et al., *Glazer & FitzGibbon on Legal Opinions* (2d ed. 2001); Comm. Legal Ops., *Legal Opinion Principles*, 53 Bus. L. 831 (1998); TriBar Op. Comm., *Third-Party "Closing" Opinions: A Report of the Tribar Opinion Committee*, 53 Bus. Law. 591 (1998); Comm. Legal Ops., *Third-Party Legal Opinion Report, Including the Legal Opinion Accord, of the Section of Business Law, American Bar Association*, 47 Bus. Law. 167 (1991)).

Because opinion givers follow these sources, the trial court considered Baker Botts' departures from them when making its finding of bad faith. And because opinion givers already follow these sources, holding that they have meaning is not a surprise. Treating those standards as having no meaning would be more unsettling.

Second, the *Post-Trial Opinion* did not create any new path for lawyer liability. Like other lawyers, opinion givers already face potential liability for legal malpractice under a negligence standard.[200] Opinion givers therefore must already contemplate potential review of their work under a standard that is less favorable to them than the bad faith standard that the *Post-Trial Opinion* used.

Third, the possibility of having to disclose the record supporting an opinion is not new. A party must waive privilege to rely on an advice-of-counsel defense, and there is no privilege between the attorney and client in a malpractice action. Revealing an underlying record is always a double-edged sword. If a party has been acting properly, then the underlying record will support their contentions. If a party has been acting improperly, then the underlying record may well undermine their contentions.

Fourth, the prospect of disclosing the work that generated the opinion should not change the extent to which clients seek legal advice. Disclosing those internal

---

[200] *Flowers v. Ramunno*, 2011 WL 3592966, at \*2, 27 A.3d 551 (Del. 2011) (order).

materials is the price of asserting an advice-of-counsel defense. An advice-of-counsel defense is powerful, and clients can assert it in many settings.

Finally, this decision and the *Post-Trial Opinion* referenced the many pressures on outside counsel. The prospect that both counsel's opinion and the underlying record could become available to the public should help buck up counsel's resolve. "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."[201]

In my view, therefore, the *Post-Trial Opinion*'s approach should not have any negative effect on the practice of rendering opinions. To the extent it has an effect, it should be a salutary one.

## II.    LEGAL ANALYSIS

The Delaware Supreme Court remanded this case with instructions to address the plaintiffs' remaining claims. This decision attempts that task. In doing so, the trial court must proceed in accordance with the Delaware Supreme Court's mandate and the law of the case.[202] The law of the case prevents the parties from relitigating

---

[201] Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914).

[202] *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 38–39 (Del. 2005); *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1128–29 (Del. 2015).

the legal rulings and factual findings from the *Post-Trial Opinion* that were left undisturbed on appeal.[203]

The outcome on remand depends on the fate of the plaintiffs' claim that the General Partner breached the Partnership Agreement by exercising the Call Right without satisfying the Opinion Condition (the "Opinion Breach"). The *Post-Trial Opinion* found that the General Partner breached the Partnership Agreement when exercising the Call Right for two separate and independent reasons. One was the Opinion Breach based on the failure to satisfy the Opinion Condition. The other was the failure to satisfy the Acceptability Condition (the "Acceptability Breach").

The *Supreme Court Opinion* plainly reversed the *Post-Trial Opinion*'s finding of an Acceptability Breach, holding that no Acceptability Breach occurred. The *Supreme Court Opinion* also plainly reversed the trial court's ruling on exculpation. The *Supreme Court Opinion* held that both the General Partner and Sole Member relied on Skadden's advice that it would be reasonable to accept the Baker Opinion, resulting in the General Partner being conclusively presumed to have acted in good faith (the "Good Faith Ruling"). The *Supreme Court Opinion* also held that because of the Good Faith Ruling, both the General Manager and Sole Member were entitled to exculpation (the "Exculpation Ruling").[204] There is no daylight between the Sole Member and Loews. Thus, by holding that the Sole Member acted "in good faith in

---

[203] *Cede & Co.*, 884 A.2d at 38–39.

[204] *Supr. Ct. Op.*, 288 A.3d at 1088.

79

exercising the call right,"[205] the *Supreme Court Opinion* seems to have determined that Loews also acted in good faith. This decision proceeds on that basis.

What happened to the Opinion Breach presents legitimate grounds for debate. The plaintiffs maintain that the *Supreme Court Opinion* did not address the Opinion Breach, leaving the finding of breach intact. The plaintiffs contend that the Good Faith Ruling only applied to the acceptability determination that was the subject of the Acceptability Breach and did not extend to the Opinion Breach.[206] They similarly contend that the Exculpation Ruling only applied to the acceptability determination, not the Opinion Breach.[207] For purposes of remand, the plaintiffs maintain that the trial court is not bound by the Good Faith Ruling or the Exculpation Ruling when considering the implications of the Opinion Breach.

Loews sees matters differently. Loews maintains that the *Supreme Court Opinion* held that *the exercise of the Call Right* was not a breach.[208] As they see it, the *Supreme Court Opinion* addressed the relief granted in the *Post-Trial Opinion*, reversed the claim for breach of the Partnership Agreement, and remanded the case for the trial court to address the plaintiffs' other claims. From Loews' perspective, the

---

[205] *Id.*

[206] Dkt. 308 at 1, 5–6.

[207] *Id.* at 6, 48–50.

[208] Dkt. 311 at 13.

80

claim for breach of contract is over, and the plaintiffs lost.[209] Under that view, the Good Faith Ruling applies to the exercise of the Call Right, encompassing both the Opinion Breach and the Acceptability Breach. Loews likewise believes that the Exculpation Ruling applies to the exercise of the Call Right, encompassing both the Opinion Breach and the Acceptability Breach.

Doubtless the justices have a clear sense of what the *Supreme Court Opinion* intended. For the trial court, "the struggle is real."[210]

The *Post-Trial Opinion* perceived that exercising the Call Right involved three steps: (1) satisfying the Opinion Condition, (2) satisfying the Acceptability Condition, and (3) making the decision to exercise. As the *Post-Trial Opinion* conceived of the framework, the first two requirements provided moderate protections for the limited partners. The Opinion Condition provide a mild dose of protection by preventing the General Partner from exercising the Call Right unilaterally, without first securing the Opinion of Counsel.[211] The Acceptability Condition provided another mild dose of

---

[209] *Id.* at 13–14.

[210] *Coster v. UIP Cos., Inc.*, 2022 WL 1299127, at *8 n. 58 (Del. Ch. May 2, 2022), *aff'd*, 300 A.3d 656 (Del. 2023). And not in a meme'ish sense. It is also an area where I have fatally misjudged matters before. *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128 (Del. 2019) (per curiam). *See generally Hyde Park Venture P'rs Fund III, L.P. v. FairXchange, LLC*, 2024 WL 3579932, at *16 (Del. Ch. July 30, 2024) (discussing *Aruba*).

[211] *See Supr. Ct. Op.*, 288 A.3d at 1116 n.256 ("[A]n Opinion of Counsel is itself a meaningful limitation regardless of who accepts it."). The Supreme Court reasoned that because the Opinion Condition provided protection for unitholders, it followed that the Acceptability Condition need not provide protection for unitholders. *Id.*

81

protection by requiring (under the trial court's view) that the GPGP Board—a decision-making body with independent directors—determine that the Opinion of Counsel was acceptable.[212] Only after satisfying both conditions would the Sole

---

Having one protection does not foreclose another. Think of belts and suspenders. *See XRI Inv. Hldgs. LLC v. Holifield*, 2024 WL 3517630, at *17 (Del. Ch. July 24, 2024) ("In its penultimate observation, the justices noted that 'it is unclear to us how XRI actually benefitted from this transfer, given its perfected security interest in the Disputed Units and the resulting Texas Litigation.' At least from the standpoint of the trial judge, this was a simple example of backup protection. The structural subordination added a belt to the suspenders of XRI's security interest." (footnote omitted)).

[212] The *Post-Trial Opinion* noted the four of the eight members of the GPGP Board were independent, so the independent members could block an acceptability determination. *See Post-Trial Op.*, 2021 WL 5267734, at *2, *10, *74. On appeal, Loews stressed that having four independent directors "was by happenstance rather than a feature dictated by the LLC Agreement, which only requires three out of a maximum of eight directors of the GPGP Board to be independent." *Supr. Ct. Op.*, 288 A.3d at 1116. That number is actually dictated by SEC regulations and NYSE rules, which require that the board of directors of a publicly traded company have an audit committee comprising at least three independent directors; if the listed company is a limited partnership, the standard applies to the board of directors of "the managing general partner, managing member, or equivalent body." *See* New York Stock Exchange Listed Company Manual § 303A.07(a); *accord* 15 U.S.C. § 78j-1(m); 17 C.F.R. § 240.10A-3(b)(1)(i), (e)(3); *see generally* Securities and Exchange Commission Office of Investor Education and Advocacy, *Updated Investor Bulletin: Master Limited Partnerships—An Introduction* (Nov. 3, 2017), available at https://www.sec.gov/resources-for-investors/investor-alerts-bulletins/ib_mlpintro; Latham & Watkins, *The Book of Jargon MLPs* 2 (2013).

Blocking ability was not necessary for a determination by a body with independent directors to benefit the limited partners. Delaware adheres to the *12 Angry Men* theory of governance, which rests on the premise that even a single director can sway the others. That is why reasonable notice of a board meeting must go to all directors, why all directors participating by remote communication must be able to hear and be heard, why directors cannot act by proxy, and why a board consent must be unanimous. *See* J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 36–38 (2015) (discussing

Member have the exclusive authority to decide whether to cause the General Partner to exercise the Call Right, including by exercising the Call Right in its own interest. But exercising the Call Right without first meeting either condition would result in breach.

The *Supreme Court Opinion* held that the Sole Member—not the GPGP Board—was the internal decision-maker empowered to make the acceptability determination for the General Partner. That reorientation suggests that the Acceptability Condition existed to protect Loews, because Loews exercised sole control over the Sole Member.[213]

---

authorities). That principle dates back to 1915, when Chancellor Curtis explained that "Each member of a corporate body has the right to consultation with the others and has the right to be heard upon all questions considered." *Lippman v. Kehoe Stenographic Co.*, 95 A. 80, 88 (Del. Ch. 1915) (Curtis, C.). Although the *Post-Trial Opinion* admittedly cited the ability of four directors to block action, the *Post-Trial Opinion* also identified the benefits of simply involving independent directors in the decision. *See Post-Trial Op.*, 2021 WL 5267734, at *1 ("[T]he LLC's board of directors included outside directors who could inject a measure of independence into the determination."); *id.* at *10 ("By contrast, if the GPGP Board made the decision for the GPGP, then the outside directors would participate in the decision."); *id.* at *23 ("Would that determination be made by Holdings, the Sole Member of the GPGP, where all the decision-makers were Loews insiders, or would the decision be made by the GPGP Board, which included outside directors?"); *id.* at *27 ("Skadden also recommended that the outside directors on the GPGP Board participate in and not abstain from the determination.").

Having three outside directors was sufficient to make routing the acceptability determination to the GPGP Board meaningfully different than having the Sole Member make it. Just one independent director would have been enough to make it significant.

[213] That still seems odd to me, because Loews could always protect itself simply by opting to have the Sole Member not exercise the Call Right. Assume the GPGP

The question becomes whether that structural determination means anything

for the Opinion Condition. One perspective might be that the Opinion Condition

becomes all the more important as the only contractual check on Call Right exercise.

But from a different perspective, that structure could imply that the Sole Member

---

Board deemed the Opinion of Counsel acceptable, but the Sole Member was not satisfied with its content. The Sole Member could protect itself by deciding not to exercise. Having the Sole Member make the acceptability determination does not offer any additional protection to Loews, but having the GPGP Board make the acceptability determination would provide incremental protection to limited partners.

When rejecting this line of reasoning, the *Supreme Court Opinion* noted that the Acceptability Condition and the decision to exercise are separate and that "[e]ven after the General Partner deemed the opinion acceptable, commercial circumstances could intervene that might cause the General Partner not to exercise." *Supr. Ct. Op.*, 288 A.3d at 1116. Completely true—and beside the point. The decision not to exercise could be made for any reason or no reason. The point is that a non-exercise decision could be based on dissatisfaction with the Opinion of Counsel, so giving the Sole Member the ability to reject the Opinion of Counsel adds nothing.

Despite stressing the separate status of the acceptability decision from the exercise decision, the *Supreme Court Opinion* elsewhere cited the unity of those decisions as a basis for rejecting the *Post-Trial Opinion*'s approach. The *Supreme Court Opinion* observed that having the GPGP Board make the acceptability determination "divorces the acceptability determination from the call right exercise" and would impair the Sole Member's exclusive authority to make the decision to exercise the Call Right. *Supr. Ct. Op.*, 288 A.3d at 1115. In the words of the opinion, that "would make the Sole Member's exclusive authority non-exclusive." *Id.* But from that perspective, the Opinion Condition is problematic, because involving a law firm before the Sole Member can act also "make[s] the Sole Member's exclusive authority non-exclusive." *Id.* Once the Opinion Condition demonstrates that the Sole Member lacks full control over the path to exercise, nothing prohibits the GPGP Board from operating as a stop along the way. Ultimately, the Sole Member has exclusive authority to exercise the Call Right. The Sole Member's exclusive authority at that stage does not mean that the Sole Member must also have sole authority over whether the two conditions are met.

determines exclusively whether the Opinion of Counsel is satisfactory, not only for purposes of the Acceptability Condition, but also for purposes of the Opinion Condition.[214]

The *Supreme Court Opinion* hints at this interpretation by stating that the Acceptability Condition could not be detached from the decision to exercise and noting that if the Acceptability Condition was analyzed separately, then it would make "the Sole Member's exclusive authority non-exclusive."[215] That statement implies that the Sole Member should have exclusive authority over every step on the path. The justices also hinted at this interpretation by saying not only that the Sole Member

---

[214] Viewed from that perspective, the acceptability determination would function akin to an expert determination by taking the issue away from the court. *See Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 615–23 (Del. 2023) (interpreting provision in stock option agreement that gave a committee of directors the "exclusive responsibility" to interpret the agreement and made their decision "shall be final and binding"). But in *Terrell*, the Delaware Supreme Court held that the decision-making structure would lead to *de novo* judicial review of the committee's decision, not no review at all or review under a good faith standard. *Id.* at 623–24. The juxtaposition of *Terrell* and *Williams* is interesting. Designate an attorney as an expert decisionmaker and make a contractual outcome turn on the attorney's opinion, and the attorney's decision is reviewed *de novo* under *Terrell*. Condition a contractual outcome on the same opinion, and the attorney's decision is reviewed for bad faith under *Williams*. I am not sure conceptually why the standard of review would be different in those two settings. If *Williams* makes sense for opinions rendered to satisfy conditions, then I would think it makes sense for opinions rendered as expert determinations. That would also have the benefit of avoiding the need for a court to conduct a *de novo* review of an expert determination. But having two distinct approaches may well be a stable equilibrium. With the different regimes on the books, one can always argue that the parties knowingly selected one regime over the other and hence that their choice should be enforced. Deference to the contractual outcome obviates further inquiry into any tensions between the two approaches.

[215] *Supr. Ct. Op.*, 288 A.3d at 1115.

and the General Partner acted in good faith not only when making the acceptability determination, but also when "exercising the call right."[216] Acting in good faith for purpose of the Call Right as a whole would seem to require also acting in good faith for purposes of the Opinion Condition.[217]

Two other passages support this reading. In one, the *Supreme Court Opinion* acknowledged the finding in the *Post-Trial Opinion* that Baker Botts rendered a contrived opinion in bad faith, then stated that the justices chose "a different path to decide this appeal."[218] But deciding the appeal would seem to require addressing both the Opinion Breach and the Acceptability Breach. The statement that "a different path" could decide the appeal implies that the justices believed their chosen path resolved both bases for breach and put the breach of contract claim to rest.

Similar comments appear in the conclusion to the *Supreme Court Opinion*. There, the justices stated, "Even though the Court of Chancery found after trial that Baker Botts provided a compromised opinion, under the Partnership Agreement and LLC Agreement, the proper focus was on the Sole Member and the opinion it received from Skadden."[219] The high court went on to state the following: "The Court of Chancery severed and stayed Counts II, III, IV, and V of Bandera's complaint pending

---

[216] *Id.* at 1123.

[217] *Id.*

[218] *Id.* at 1117.

[219] *Id.* at 1123.

86

appeal. Thus, we reverse the Court of Chancery's partial final judgment and remand for further proceedings consistent with this opinion."[220] Those concluding sentences notably omitted any reference to Count I, where the plaintiffs asserted their claim for breach of the Partnership Agreement due to the General Partner's failure to satisfy either the Opinion Condition or the Acceptability Condition. The omission suggests the justices believed the breach of contract claim was over.

Significantly, the justices knew about the issue the *Supreme Court Opinion* potentially created by not expressly addressing the Opinion Breach. In a footnote, the *Concurring Opinion* observed that the principal opinion "leaves the findings regarding Baker's Opinion in place" and therefore "a necessary precondition to the exercise of the Call Right was not satisfied."[221] Even with this nudge, the *Supreme Court Opinion* adhered to its different path and seemingly treated that path as resolving all of the issues presented by the breach of contract count.

This decision therefore proceeds as if the *Supreme Court Opinion* resolved all aspects of the breach of contract claim in the General Partner's favor (the "No Breach View"). But in case that reading misses the mark (and in hopes of avoiding another remand), this decision also analyzes the remand under two alternative views, each of which treats the Opinion Breach as law of the case. One treats the Good Faith Ruling as encompassing the Opinion Breach, not just the acceptability determination (the

[220] *Id.*

[221] *Concurring Op.*, 288 A.3d at 1124 n.1.

87

"Good Faith View"). The other adopts the plaintiffs' position and treats the Opinion Breach as a separate breach not covered by the Good Faith Ruling or the Exculpation Ruling (the "Separate Breach View").

## A. The Claim That Loews Tortiously Interfered With The Partnership Agreement

The plaintiffs sought to prove at trial that Loews tortiously interfered with the Partnership Agreement by knowingly procuring the contrived Baker Opinion and then causing the General Partner to exercise the Call Right without satisfying the Opinion Condition.[222] Under the No Breach View, Loews prevails. Under the Good Faith View, the question is closer, but Loews again prevails. Under the Separate Breach View, the plaintiffs prevail. To my mind, either the No Breach View or the Good Faith View constitutes the more persuasive reading of the *Supreme Court Opinion*. This decision therefore will enter judgment in favor of the defendants.

### 1. Choice of Law

Loews argued for the first time on remand that New York law, rather than Delaware law, governs the tortious interference claim. Loews waived that argument by not raising it during post-trial briefing the first time around; instead, Loews argued for Texas law.

---

[222] Originally, the plaintiffs also relied on the Acceptability Breach. The *Supreme Court Opinion* clearly reversed the *Post-Trial Opinion* on that issue, leaving only the Opinion Breach as a potential basis for the tortious interference claim.

Assuming the argument was not waived, it is not persuasive. Delaware has a significant relationship to this dispute because all of the entities in the stack running from Boardwalk up to Loews are Delaware entities. The tortious interference claim involves interference with the Partnership Agreement, which is a contract governed by Delaware law.[223] Regardless, New York law does not differ from Delaware law on the pertinent issues and would not generate a different result.[224]

### 2. The Elements Of A Tortious Interference Claim

To prevail on a claim for tortious interference with contract, a plaintiff must prove (1) the existence of a contract, (2) about which defendant knew, *and* (3) an intentional act by the defendant that is a significant factor in causing a breach of contract, (4) taken without justification, (5) and which causes injury.[225] Loews invokes the so-called "stranger rule," which imposes an additional requirement that the interfering party be a stranger to the contractual relationship.[226] This court previously rejected the stranger rule as inconsistent with Delaware law.[227] That ruling is law of the case, and the court declines to revisit it.

---

[223] *See* PA §§ 2.1, 16.8.

[224] *See CRE Niagara Hldgs., LLC v. Resorts Gp. Inc.*, 2022 WL 1749181, at *13 (Del. Super. May 31, 2022).

[225] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP* (*MTD Opinion*), 2019 WL 4927053, at *25 (Del. Ch. Oct. 7, 2019) (citation omitted).

[226] *See* Dkt. 313 at 19–23.

[227] *MTD Op.*, 2019 WL 4927053, at *27–29.

Two of the elements are easy: The Partnership Agreement was a contract, and Loews knew about it. Another element is almost as easy: Assuming that a breach occurred, it led to a damages finding that is law of the case. That leaves the two critical issues: whether an intentional act by the defendant was a significant factor in causing a breach of contract, and whether the defendant acted without justification.

### 3. An Intentional Act That Is A Significant Factor In Causing Breach

The third element of a claim for tortious interference requires an intentional act that is a significant factor in causing a breach. Whether the plaintiffs satisfied this factor turns on the proper interpretation of the *Supreme Court Opinion*.

Under the No Breach View, exercising the Call Right did not breach the Partnership Agreement. That alone warrants entering judgment for Loews on the tortious interference claim.

Under the Good Faith View and the Separate Breach View, the Opinion Breach constitutes a separate breach, so the question becomes whether Loews engaged in an intentional act that was a significant factor in causing a breach of contract. Notably, the intentional act need not be tortious, only intentional. To emphasize this point, the Restatement (Second) of Torts describes the tort as "intentional interference with the performance of contract by third person" and notes that the tort extends to

90

"nontortious methods of inducement."[228] An independently tortious method of interference makes a finding of improper interference more likely, so "the nature of [the] conduct is an important factor," but a tortious method of interference is not required.[229]

Alpert's conduct in soliciting the Baker Opinion satisfies the requirement for an intentional act. Alpert was Loews' Senior Vice President and General Counsel. Loews agrees that Alpert was principally responsible for procuring the contrived Baker Opinion. Alpert intentionally sought out the Baker Opinion, and he therefore took actions intentionally on Loews' behalf that were a significant factor leading to the Opinion Breach. Under the Good Faith View and the Separate Breach View, the satisfied this element.

### 4. Lack Of Justification

The fourth element of a tortious interference claim asks whether the interference lacked justification, with this element sometimes framed as asking whether the interference was improper. "The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference with the

---

[228] Restatement (Second) of Torts § 766, cmt. c (Am. L. Inst. 1979), Westlaw (database updated June 2024).

[229] *Id.* at § 766 cmt. c.

promisor's performance."[230] "The adjective 'improper' is critical. For participants in a competitive capitalist economy, some types of intentional interference with contractual relations are a legitimate part of doing business."[231] If a party can justify interfering with a contract, then the interference is not improper. Determining when interference becomes improper requires a "complex normative judgment relating to justification" based on the facts of the case and "an evaluation of many factors."[232]

The Delaware Supreme Court has adopted the factors identified in Section 767 of the Restatement (Second) of Torts as considerations to weigh when evaluating the existence of justification—or put differently, whether the interference was improper.[233] The factors are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.[234]

---

[230] *Shearin v. E.F. Hutton Gp.*, 652 A.2d 578, 589 (Del. Ch. 1994).

[231] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014).

[232] *Shearin*, 652 A.2d at 589 (internal quotation marks omitted).

[233] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del 2012) (citing Restatement (Second) of Torts § 767 (Am. L. Inst. 1979), Westlaw (database updated June 2024)).

[234] *Id.*

Weighing the seven factors involves a fact-specific inquiry.[235] When analyzing improper interference, Delaware courts have given significant weight to findings that a defendant acted maliciously, in bad faith, or with an intent to extract a benefit to which the defendant was not entitled.[236]

Because the tortious interference claim has already failed under the No Breach View, we need not consider that interpretation of the *Supreme Court Opinion.* The balancing comes out differently under the Good Faith View and the Separate Breach View.[237] Under the former, Loews' conduct was justified and not improper. Under the latter, the opposite is true. Because the Good Faith View seems more faithful to the *Supreme Court Opinion*, the absence of improper interference provides an alternative basis for entering judgment in Loews' favor on the tortious interference claim.

---

[235] *See* Restatement (Second) of Torts § 767 cmt. b (Am. L. Inst. 1979), Westlaw (database updated June 2024) ("[T]his branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege . . . . Since the determination of whether an interference is improper is under the particular circumstances, it is an evaluation of these factors for the precise facts of the case before the court.").

[236] *E.g., Skye Mineral Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2021 WL 3184591, at *16 (Del. Ch. July 28, 2021) (holding that defendants "exploit[ing] their control . . . in an effort to put CSM back in default under that loan, for the sole purpose of enriching themselves to the detriment of SMP and CSM" was sufficient to support an inference that their actions were without justification); *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *1–2, *30 (Del. Ch. Nov. 17, 2014) (finding after trial that parent tortiously interfered with escrow agreement by "divert[ing] approximately $5.9 million" as part of "a quid pro quo for [parent's] own benefit").

[237] *See Supr. Ct. Op.*, 288 A.3d at 1088.

### a.     The Nature of Loews' Conduct

The first Restatement factor asks about the nature of the actor's conduct. Under the Good Faith View, Loews caused the Sole Member to exercise the Call Right in good faith. Under that version of the *Supreme Court Opinion*, Loews permissibly exercised a contract right it possessed under the Partnership Agreement. Loews could cause the Sole Member to exercise the Call Right self-interestedly and free of fiduciary obligation.[238]

By contrast, under the Separate Breach View, the first factor favors a finding of improper interference. From that perspective, Loews had no right to cause the General Partner to exercise the Call Right without first satisfying the Opinion Condition. Once Loews satisfied the necessary conditions, then Loews could cause the General Partner to exercise the Call Right in its own interest and free of any fiduciary

---

[238] Lengthy sections of the *Supreme Court Opinion* describe the disclosures about the Call Right and the elimination of fiduciary duties, treating them as supporting a *caveat emptor* approach to the interpretation of contractual rights in limited partnership agreements. *Supr. Ct. Op.*, A.3d at 1108–10, 1112–14, 1116, 1119–20. Under that approach, the disclosures and the elimination of fiduciary duties operate as interpretive signals that the Call Right itself must be a minimal protection and read narrowly. *See id.* at 1116 (construing the terms of the Partnership Agreement in light of "the overall scheme of Boardwalk's sponsor-friendly MLP framework"). From my perspective, those factors simply meant that the limited partners' only remedies would be contractual, so a court needed to analyze the Call Right in accordance with its terms. Those contractual terms might be strict or lenient, but they would provide the measure of the right. Indeed, one could imagine that if there had been a real negotiation over the terms of the Partnership Agreement, then a counterparty might insist on stronger contractual protections as the price of giving up fiduciary protections. It thus does not follow that the elimination of fiduciary duties signals weaker contractual protections. The opposite could be true.

responsibility, but the necessary conditions had to be met first. Under the Separate Breach View, rather than simply choosing to exercise a contract right that it could freely invoke, Loews manipulated a contract right that it could not legitimately exercise (due to the failure of the Opinion Condition) to extract value from the public unitholders. Viewed from that standpoint, the first factor favors finding that Loews acted without justification.

### b. Loews' Motive

The second Restatement factor asks about the actor's motive. Under the Good Faith View, Loews acted in good faith when exercising the Call Right. This factor cuts against a finding of improper interference.

Under the Separate Breach View, this factor favors a finding of improper interference. Yes, Loews could exercise the Call Right in its own self-interest, but only after the Opinion Condition was met. Under the Separate Breach View, Loews manufactured grounds for exercising the Call Right when its requirements were not met. That motive reflected a desire to take what Loews was not entitled to have. From that perspective, the second factor supports a finding that Loews acted without justification.

### c. The Interests Of The Subjects Of The Interference

The third Restatement factor examines the interests of the subjects of the interference. Here, those subjects were the minority unitholders who had an interest in the Call Right being exercised in accordance with its terms.

Under either view, the third factor favors a finding of improper interference. Under the Separate Breach View, Loews violated the expectations of the limited partners by not exercising the Call Right in accordance with its terms. Under the Good Faith View, even though Loews acted in good faith when it caused the Sole Member to exercise the Call Right, there was still a breach. That breach impaired the rights of the limited partners, who had an interest in having the terms of the Partnership Agreement observed. By breaching the Partnership Agreement, Loews violated those expectations, even if Loews acted in good faith.

### d.     The Interests Advanced By The Actor

The fourth Restatement factor is the interests sought to be advanced by the actor. Under either review, if the Opinion Breach remains intact, then Loews caused the General Partner to breach the Partnership Agreement. Loews did not have a right to breach the Partnership Agreement, even if it acted in good faith. The fourth factor therefore favors a finding of improper interference.

### e.     The Social Interests At Stake

The fifth Restatement factor examines the social interests at stake. That could lead to an expansive inquiry. In theory, one might consider the knock-on effects of a decision either permitting or condemning the conduct in which Loews engaged; its implications for capital formation, including the cost of capital for Delaware limited partnerships; and possible effects on the trading price. But those issues fall primarily with the domain of federal law and the Securities and Exchange Commission, which has the mandate to consider market-wide implications.

96

From a Delaware law perspective, the social interests at stake are largely co-extensive with compliance with the Partnership Agreement. As the justices explained on appeal,

> Delaware courts respect the terms of a partnership's governing agreements to preserve the "maximum flexibility" of contract. Our strict approach to contract interpretation and enforcement "puts investors on notice" regarding the primacy of partnership agreements "and therefore that investors should be careful to read partnership agreements before buying units."[239]

Because both the Good Faith View and the Separate Breach View involve a situation where Loews violated expectations by causing the General Partner to breach the Partnership Agreement, the fifth factor supports a finding of improper interference, regardless of whether Loews believed it was acting in good faith.

### f.     The Proximity Of The Actor's Conduct

The sixth Restatement factor is the proximity or remoteness of the actor's conduct to the interference. This factor supports a finding of improper interference under either the Good Faith View or the Separate Breach View, because there were no other dominos that had to fall before Loews' actions had a result. Loews acted directly through the Sole Member to cause the General Partner to exercise the Call Right. Likewise, Loews acted directly through Alpert, its employee and agent, to procure the contrived Baker Opinion. Loews' actions directly and proximately caused the interferences. To the extent there was improper interference, Loews caused it.

---

[239] *Id.* at 1108 (citation and footnote omitted).

### g. The Relationship Between The Parties

The final factor is the relationship between the parties. The relationship involved a general partner and the partnership's limited partners. Once, the relationship among partners called for a "punctilio of an honor most sensitive."[240] Today, the watchwords are *caveat emptor*.[241]

Because the relationship between the General Partner and Boardwalk's limited partners was solely contractual, the same analysis applies. Regardless of whether Loews thought it was exercising the Call Right in good faith, Loews violated the contractual relationship between the General Partner and the limited partners.

### h. The Conclusion Regarding Justification

Multi-factor tests are not a score card. The court must consider how to weigh the competing factors to determine whether interference was justified. Under the Good Faith View, Loews actions were sufficiently justified. Under that approach, Loews was conclusively held to have acted in good faith for purposes of exercising the Call Right in its entirety, not just for purpose of the acceptability determination. The *Supreme Court Opinion* seems to have regarded the exercise of the Call Right as appropriate, even assuming the existence of the Opinion Breach. Under the Good Faith View, the tortious interference claim fails because Loews did not engage in improper interference.

---

[240] *Meinhard v. Salmon*, 249 N.Y. 458, 464 (N.Y. 1928).

[241] *See Supr. Ct. Op.*, 288 A.3d at 1110.

Under the Separate Breach View, Loews actions were not justified, and causing the General Partner to exercise the Call Right constituted improper interference with the Partnership Agreement. Under that approach, all of the factors point towards unjustified interference.

**5.     The Conclusion Regarding The Claim For Tortious Interference**

The No Breach View is the most plausible readings of the *Supreme Court Opinion*. Under the No Breach View, there was no underlying breach, and judgment will be entered in favor of the defendants on the tortious interference claim.

The next most plausible interpretation of the *Supreme Court Opinion* is the Good Faith View. Under that view, the factors point in different directions. When, however, the overarching inquiry assesses whether Loews engaged in improper interference or acted without justification, the Delaware Supreme Court's ruling that Loews acted in good faith seems dispositive.

Although applying the Separate Breach View would support a finding of tortious interference, that interpretation of the *Supreme Court Opinion* seems least likely. The court therefore will enter judgment in favor of the defendants on the tortious interference claim.

**B.     The Claim For Breach Of The Implied Covenant**

The plaintiffs also sought to prove at trial that Boardwalk and the General Partner breached the implied covenant of good faith and fair dealing by securing the contrived Baker Opinion. There is no room for the implied covenant in this case.

99

"The implied covenant is inherent in all contracts and ensures that parties do not frustrate the fruits of the bargain by acting arbitrarily or unreasonably."[242]

> The implied covenant . . . is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.[243]

To prevail on an implied covenant claim, a plaintiff must prove "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[244]

When determining whether to invoke the implied covenant, a court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[245] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a

---

[242] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1116 (Del. 2022) (alteration and internal quotation marks omitted).

[243] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (citations and internal quotation marks omitted).

[244] *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

[245] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, No. 399, 2014, 2015 WL 803053 (Del. Feb. 26, 2015) (unpublished table decision).

gap that the implied covenant might fill."[246] The court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right."[247] "[B]ecause the implied covenant is, by definition, implied, and because it protects the spirit of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[248]

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled."[249] One reason a gap might exist is if the parties negotiated over a term and rejected it. The implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table."[250]

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible

---

[246] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

[247] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

[248] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009).

[249] *Allen v. El Paso Pipeline*, 113 A.3d at 183.

[250] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

contingency."[251] "In only a moderately complex or extend [sic] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible."[252]

Equally important, "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."[253] "The implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."[254]

Once the plaintiff has established the existence of a contractual gap that can be filled, the plaintiff must show "from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter."[255] "The implied covenant seeks to enforce the parties' contractual

---

[251] *Amirsaleh v. Bd. of Trade of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008).

[252] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

[253] *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (cleaned up); *see* 6 *Corbin on Contracts* § 26.15 (2024).

[254] *Dieckman v. Regency GP LP*, 155 A.3d 358, 361 (Del. 2017).

[255] *Katz*, 508 A.2d at 880.

bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them."[256] "[A] reviewing court does not simply introduce its own notions of what is fair or reasonable under the circumstances."[257] Although its name includes the concepts of "good faith" and "fair dealing," the implied covenant does not establish a "free-floating" requirement that a party act in some morally commendable sense.[258] When used with the implied covenant, the term "good faith" contemplates "faithfulness to the scope, purpose, and terms of the parties' contract."[259] It "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."[260] The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose."[261] The application of these concepts turns "on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally."[262]

---

[256] *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013) (internal quotation marks omitted)*, overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013).

[257] *Allen v. El Paso Pipeline*, 113 A.3d at 184.

[258] *See Gerber*, 67 A.3d at 418–19.

[259] *Id.* at 419 (emphasis and internal quotation marks omitted).

[260] Restatement (Second) of Contracts § 205 cmt. a (Am. L. Inst. 1981), Westlaw (database updated June 2024).

[261] *Gerber*, 67 A.3d at 419 (internal quotation marks omitted).

[262] *Id.* (emphasis and internal quotation marks omitted).

To supply an implicit term, the court "looks to the past" and asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting."[263] The court seeks to determine "whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter."[264]

The Delaware Supreme Court has admonished against a free-wheeling approach to the implied covenant. Invoking it is a "cautious enterprise."[265] Implying contract terms is an "occasional necessity . . . to ensure [that] parties' reasonable expectations are fulfilled."[266] Its use "should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness."[267]

### 1. Was The Implied Covenant Claim Waived?

Loews initially argues that the plaintiffs waived any implied covenant claim because the operative complaint going into trial did not include a count specifically

---

[263] *Id.* at 418 (internal quotation marks omitted).

[264] *Id.* (internal quotation marks omitted).

[265] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).

[266] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks omitted).

[267] *Id.* (alterations and internal quotation marks omitted).

titled "breach of the implied covenant." The plaintiffs contend that they did not need to do that, but that if they did, then the pleadings should be amended to conform to the evidence under Rule 15(b).

In the recent *Holifield* decision, the Delaware Supreme Court evaluated the question of waiver by considering whether a party (i) included a claim in a pleading, (ii) identified the claim in a pre-trial order, (iii) raised the issue in post-trial briefing, or (iv) addressed the issue in post-trial briefing.[268] Under the *Holifield* standard, the plaintiffs did not waive the implied covenant claim.

In the complaint that the plaintiffs stood on for purposes of the defendants Rule 12(b)(6) motion, the plaintiffs pled two different versions of an implied covenant claim. Count I sought "a declaratory judgment that Loews breached the express terms of the Partnership Agreement, the implied covenant of good faith and fair dealing, and their fiduciary duties."[269] Count III asserted that Boardwalk, the General Partner, and the GPGP breached the implied covenant "by (i) manipulating the call price of the Call Right, and (ii) relying on the [Baker] Opinion."[270] The court held that the Call Right claim survived but that the implied covenant claim based on the Baker

---

[268] *See Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 936–37 (Del. 2023) (holding that plaintiff preserved a claim for damages despite not presenting any evidence on damages at trial because the plaintiff's complaint included a request for damages, the parties referenced damages in the pre-trial order, and the plaintiff briefly referenced the issue in post-trial briefing and argument).

[269] *MTD Op.*, 2019 WL 4927053, at *6.

[270] *Id.* at *21.

Opinion duplicated the express claim for breach of contract under the Call Right and therefore failed to state a claim on which relief could be granted.[271]

In the pre-trial order, the plaintiffs clearly identified an implied covenant claim as an issue of fact and law to be addressed at trial. One of the issues was "[w]hether Defendants Boardwalk, [the General Partner], and [the Sole Member's] reliance on the Opinion of Counsel breached the implied covenant of good faith and fair dealing."[272] Citing the Delaware Supreme Court's decision in *Gerber*, the plaintiffs advanced the implied covenant claim in their pre-trial brief, where they argued that Loews violated the implied covenant by relying on a flawed Baker Opinion.[273] The plaintiffs argued that the Baker Opinion would not "'fulfill its basic function' because it was 'unresponsive' to the key question posed"[274] and would result in "the type of arbitrary, unreasonable conduct that the implied covenant prohibits."[275] That is precisely the argument the plaintiffs make now, and they rely on precisely the same authority.[276]

---

[271] *Id.* at *24.

[272] Dkt. 246 ¶ 414.

[273] Dkt. 231 at 74–76 (citing *Gerber v. Enter. Prods. Hldgs, LLC*, 67 A.3d 400, 419, 422, 423, (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013))

[274] *Id.* at 75 (quoting *Gerber*, 67 A.3d at 422).

[275] *Id.* at 76 (internal quotation marks omitted) (quoting *Gerber*, 67 A.3d at 422)

[276] Dkt. 308 at 31.

During trial, the plaintiffs adduced evidence pertaining to the implied covenant claim, albeit largely coextensive with the evidence for the express breach of contract claim. During post-trial briefing, the plaintiffs again raised the claim, arguing that "Defendants prevented Boardwalk's minority unitholders from receiving the benefit of [their] bargain by engineering a fatally flawed Opinion of Counsel."[277] Rather than arguing waiver, Loews responded to the claim on the merits.[278]

The *Post-Trial Opinion* identified the implied covenant claim but declined to reach the issue because of its analysis of the Call Right:

> As an alternative theory of breach, the plaintiffs contend that the General Partner breached the implied covenant of good faith and fair dealing that inheres in every contract governed by Delaware law. Because the court has held that the General Partner breached the express terms of the Partnership Agreement, there is no need to reach the implied covenant.[279]

When asking the parties to prepare a Rule 54(b) order that would permit Loews to appeal immediately, the court stated that "[t]he partial final judgment will not extinguish the separate claims for breach of the implied covenant of good faith and fair dealing against the General Partner or for tortious interference and unjust enrichment against the General Partner's affiliates."[280] On appeal, the Delaware

---

[277] Dkt. 271 at 78.

[278] Dkt. 274 at 82–83.

[279] *Post-Trial Op.*, 2021 WL 5267734, at *89.

[280] *Id.* at *90.

107

Supreme Court noted that the trial court had severed and stayed the other counts that the plaintiffs had advanced and remanded the case with instructions to address them.[281]

And yet Loews argues that the claim was waived.[282] It was not.

## 2. The Implied Covenant Challenge To The Baker Opinion

On the merits of the implied covenant claim, the plaintiffs argue that by requiring that the General Partner obtain an Opinion of Counsel before exercising the Call Right, the Partnership Agreement implicitly prevented the General Partner from procuring an illegitimate opinion that relied on assumptions and financial data contrary to the factual reality that everyone recognized at the time.[283] Such an opinion is not a real opinion. The plaintiffs argue that in the original bargaining position, a counterparty would never agree that such an opinion would suffice.

To support their theory, the plaintiffs rely on the Delaware Supreme Court's decision in *Gerber*.[284] That litigation involved a limited partner's effort to challenge a

---

[281] *Supr. Ct. Op.*, 288 A.3d 1083, 1123 (Del. 2022) ("The Court of Chancery severed and stayed Counts II, III, IV, and V of Bandera's complaint pending appeal. Thus, we reverse the Court of Chancery's partial final judgment and remand for further proceedings consistent with this opinion.").

[282] Dkt. 311 at 31–32.

[283] Dkt. 308 at 30.

[284] Dkt. 308 at 30–31 (citing *Gerber v. Enter. Prods. Hldgs, LLC*, 67 A.3d 400, 420–21, 422–23 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013)).

complex series of interested transactions. One involved the general partner selling an entity for $100 million two years after purchasing it for $1.1 billion. A special committee of the general partner's board approved the sale, relying on a fairness opinion to conclude that the consideration received was fair. The fairness opinion, however, addressed both the sale and a prior transaction; it did not opine solely on the consideration received in the sale.[285] In another transaction, the same committee approved an interested merger, again relying on a fairness opinion, where one of the effects of the merger was to eliminate pending derivative claims. The fairness opinion did not attempt to value the extinguished claims.[286]

Invoking a provision like the Conclusive Presumption Provision at issue in this case, the general partner argued that its reliance on a fairness opinion gave rise to a conclusive presumption of good faith. The Court of Chancery held that the conclusive presumption led to the dismissal of both an express breach of contract claim and a related implied covenant claim.[287]

On appeal, the Delaware Supreme Court held that the conclusive presumption did *not* bar the implied covenant claim.[288] The justices explained that the concept of good faith as used in the implied covenant differs from the concept of good faith in

---

[285] *Gerber*, 67 A.3d at 406.

[286] *Id.* at 407–08.

[287] *Id.* at 412–13, 413–14.

[288] *Id.* at 416.

other settings, which turns on subjective belief. Good faith for purposes of the implied

covenant instead means fealty to the purpose of the contract. Having drawn that

distinction, the high court addressed the error in the trial court's reasoning:

> Were we to adopt the Vice Chancellor's construction of [the Conclusive Presumption Provision], that would lead to nonsensical results. Examples readily come to mind of cases where a general partner's actions in obtaining a fairness opinion from a qualified financial advisor themselves would be arbitrary or unreasonable, and thereby frustrate the fruits of the bargain that the asserting party reasonably expected. To suggest one hypothetical example, a qualified financial advisor may be willing to opine that a transaction is fair even though (unbeknownst to the advisor) the controller has intentionally concealed material information that, if disclosed, would require the advisor to opine that the transaction price is in fact not fair. More extreme would be a case where the controller outright bribes the financial advisor to opine (falsely) that the transaction is fair. In a third example, the financial advisor, eager for future business from the controller, compromises its professional valuation standards to achieve the controller's unfair objective. Although plaintiffs could properly challenge this conduct under the implied covenant, the court's reasoning, if upheld, would preclude those claims. We therefore conclude that the Court of Chancery erred in holding that [the Conclusive Presumption Provision] bars a claim under the implied covenant.[289]

Ruling on a motion to dismiss the complaint, the justices found it reasonably

conceivable that the first fairness opinion breached the implied covenant because the

financial advisor addressed the total consideration received in two transactions,

rather than examining the transaction at issue independently. The fairness opinion

was fatally flawed because it "did not value the consideration that the LP unitholders

---

[289] *Gerber*, 67 A.3d at 420–21 (alteration, citation, and internal quotation marks omitted).

actually received."[290] The justices reached the same conclusion for the second fairness opinion.[291]

Like this case, the *Gerber* case also involved a conclusive presumption of good faith where the general partner relied on an expert. The Delaware Supreme Court noted that "[w]hen Gerber purchased [limited partnership] units, he agreed to be bound by the [partnership agreement's] provisions, which conclusively deemed [the general partner's] contractual fiduciary duty to be satisfied, if [the general partner] relied upon the opinion of a qualified expert."[292] But the justices held that the limited partners "could hardly have anticipated that [the general partner] would rely upon a fairness opinion that did not fulfill its basic function—evaluating the consideration the LP unitholders received for purposes of opining whether the transaction was financially fair."[293] The justices reasoned that "we may confidently conclude that, had the parties addressed the issue at the time of contracting, they would have agreed that any fairness opinion must address whether the consideration received . . . was fair" before the general partner could rely on it. The Delaware Supreme Court

---

[290] *Id.* at 422.

[291] *Id.* at 422–23.

[292] *Id.* at 422.

[293] *Id.*

concluded, "That is the type of arbitrary, unreasonable conduct that the implied covenant prohibits."[294]

At first pass, the *Gerber* decision seems like a perfect fit for this case, albeit with a legal opinion substituting for a fairness opinion. But the two situations are orthogonal. This case would only map the *Gerber* decision if the Sole Member and General Partner had relied directly on the Baker Opinion. In that context, the *Gerber* decision's reasoning would support evaluating whether reliance on the Baker Opinion breached the implied covenant. Like the hypothetical fairness opinion that the *Gerber* court envisioned, the Baker Opinion did not fulfill its purpose. The Partnership Agreement called for the Opinion of Counsel to address the effect of a change in FERC tax policy on "maximum applicable rates." Baker Botts interpreted that term reasonably to mean recourse rates, but then did not opine based on the implications of that term. The Baker Opinion contained an undisclosed assumption that recourse rates were the same as the hypothetical indicative rates that Boardwalk's subsidiaries could charge if (i) someone filed rate cases against Boardwalk's three subsidiaries, (ii) each of Boardwalk's pipelines was treated as having only one indicative rate, (iii) Boardwalk lost each of the rate cases, and (iv) FERC set new recourse rates based on a single issue—the change in tax allowance—rather than going through all the steps of cost-of-service ratemaking. The Baker Opinion thus

---

[294] *Id.*

addressed a different issue than the effect of the March 15 FERC Actions on Boardwalk's recourse rates.

The analogy to *Gerber* fails, however, because the Good Faith Ruling and the Exculpation Ruling did not result from the Sole Member and the General Partner relying on the Baker Opinion. They resulted from the Sole Member and General Partner relying on Skadden's advice.[295] The plaintiffs did not point to flaws in Skadden's advice that would meet the *Gerber* standard.

The *Supreme Court Opinion* held that Loews and the Sole Member properly relied on the Skadden's advice, resulting in the Good Faith Ruling and the Exculpation Ruling.[296] Unlike in *Gerber*, the conclusive presumption in this case operated based on a different opinion than the one that was facially flawed. *Gerber* is therefore distinguishable. By relying on Skadden's separate advice, the Sole Member and the General Partner gained the benefit of a conclusive presumption of good faith and the benefits of exculpation.

In addition, an implied covenant breach cannot support recovery in this case because the Opinion Condition required that the General Partner obtain an Opinion of Counsel, and under *Williams*, a court analyzes the sufficiency of the opinion under

---

[295] *Supr. Ct. Op.*, 288 A.3d 1083, 1118–23 (Del. 2022).

[296] *Supr. Ct. Op.*, 288 A.3d at 1118–23.

a good faith standard.[297] The implied covenant analysis in *Gerber* does not expressly include a mental state component, so the implied term would conflict with an express term. When that happens, the express term controls.

One could interpret the references in *Gerber* to "arbitrary" and "unreasonable" conduct as requiring conduct that could rise to the level of bad faith. If so, then the analysis *Gerber* contemplates tracks the *Williams* standard. Consistent with their equivalence, the *Post-Trial Opinion* incorporated the *Gerber* concept into its analysis of the Baker Opinion. When setting out the parameters that the court would consider for purposes of evaluating good faith under *Williams*, the court cited *Gerber* and considered the disconnect between what the Baker Opinion claimed to analyze (recourse rates) and what Baker Botts actually analyzed (hypothetical maximum rates).[298]

The plaintiffs therefore already benefited from a *Gerber*-style analysis, leaving no additional work for the implied covenant to do. To the extent a separate implied covenant analysis would take an objective approach to the sufficiency of the Baker Opinion, it would conflict with the good faith standard under *Williams*. And because the Sole Member and General Partner relied on Skadden's advice, they are entitled to exculpation even for an implied covenant breach.

---

[297] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *11 (Del. Ch. June 24, 2016) ("[I]t is [counsel]'s subjective good-faith determination that is the condition precedent."), *aff'd*, 159 A.3d 264 (Del. 2017).

[298] *Post-Trial Op.*, 2021 WL 5267734, at *53 (Del. Ch. Nov. 12, 2021).

Judgment will be entered in favor of the defendants on the implied covenant claim.

## C. The Claim That Loews Was Unjustly Enriched By The Call Right Exercise

The plaintiffs also sought to prove that Loews was unjustly enriched by the exercise of the Call Right. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[299] The elements of a claim for unjust enrichment are "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, [and] (4) the absence of justification."[300]

"Delaware courts . . . have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by

---

[299] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 875 (Del. 2020) (internal quotation marks omitted).

[300] *See Garfield v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022). Before *Garfield*, standard Delaware formulation of the elements of an unjust enrichment claim used to include a fifth element, the absence of a remedy provided by law. *E.g.*, *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). However, in *Garfield*, the court found it is not necessary under Delaware law for a plaintiff to plead or later prove the absence of an adequate remedy at law for an unjust enrichment claim. *Garfield*, 277 A.3d at 346–51.

And although not critical to this case, blackletter sources recognize that there are situations where a plaintiff need not plead a distinct impoverishment to support a claim for unjust enrichment. *Restatement (Third) of Restitution and Unjust Enrichment* § 1 cmt. a (Am. L. Inst. 2011), Westlaw (database updated June 2024). *See generally Garfield*, 277 A.3d at 343–46.

contract."[301] At the pleading stage, it may be difficult to assess whether an unjust enrichment claim is duplicative, which warrants giving the plaintiff the benefit of the doubt and not dismissing an arguably duplicative claim.[302] At this point, whether Loews received an unjust enrichment depends on contractual compliance. Loews would be unjustly enriched if it received benefits arising from breach. Loews would not be unjustly enriched if it received benefits in compliance with the contract.

Judgment will be entered in favor of the defendants on the unjust enrichment claim.

## D. The Claim That The Defendants' Disclosures Distorted The Call Right Exercise Price

The plaintiffs finally claim that Loews are liable for gaming the Call Right's pricing mechanism by issuing the Potential Exercise Disclosures to put downward pressure on Boardwalk's unit price while giving themselves maximum optionality. The plaintiffs now agree that the federal securities laws required some level of disclosure, but they continue to advance a variety of disclosure-related breaches.

---

[301] *Nemec v. Shrader*, 2009 WL 1204346, at *6 (Del. Ch. Apr. 30, 2009), *aff'd on other grounds by* 991 A.2d 1120 (Del. 2010); *accord City of Pittsburgh Comprehensive Mun. Pension Tr. Fund v. Conway*, 2024 WL 1752419, at *26 (Del. Ch. Apr. 24, 2024); *SerVaas v. Ford Smart Mobility LLC*, 2021 WL 3779559, at *11 (Del. Ch. Aug. 25, 2021).

[302] *E.g.*, *Garfield*, 277 A.3d at 362 (denying pleading-stage motion to dismiss arguing duplicative unjust enrichment claim); *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *18 (Del. Ch. June 11, 2020) (same).

The plaintiffs identify a list of additional information that they claim Boardwalk and Loews were required to disclose.[303] They failed to prove, however, that any of those matters represented material omissions. Adding the information could have been helpful for limited partners, but it was not material.

The parties dispute whether the issuance of the Potential Exercise Disclosures created a conflict of interest for the General Partner. Assuming it did, Section 7.9(a) of the Partnership Agreement required the disclosure to be "fair and reasonable to the Partnership."[304] By providing the disclosures required by law, the General Partner fulfilled that obligation.

Judgment will be entered in favor of Loews on the disclosure claim.

### III.   CONCLUSION

Judgment will be entered in favor of the defendants on all remaining claims. The parties will confer on a form of order that will bring this action to a close at the trial court level.

---

[303] *See* Dkt. 308 at 38–39.

[304] JX 352 at 84.